United States District Court
Southern District of Texas
**ENTERED**
August 18, 2022
Nathan Ochsner, Clerk

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| OCCIDENTAL PETROLEUM CORP. | § | |
| AND ANADARKO PETROLEUM CORP., | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. H-21-1126 |
| | § | |
| WELLS FARGO BANK, N.A., | § | |
| | § | |
| Defendant. | § | |

**MEMORANDUM AND ORDER**

This case involves missteps in executing planned stock sales that delayed the sales long enough for the global pandemic and stock market drop to greatly reduce the selling price. Wells Fargo was the trustee for a so-called rabbi trust that held stock and money to pay deferred compensation to high-level executives at an oil and gas company, with a favorable tax treatment. The company recommended to Wells Fargo that it diversify the trust holdings and sell the company's shares in the trust on specific dates in January 2020. Wells Fargo agreed to follow the recommendation, but it did not follow through. Wells Fargo failed to sell most of the shares until March 2020. By that time, COVID had hit and the stock market had plummeted. The result was a roughly $39 million drop between the share price in January and the price when the shares were sold in March.

The company, Occidental Petroleum, and its predecessor, Anadarko Petroleum, (together, Occidental) sued Wells Fargo for the losses Occidental alleged resulted from the botched sales efforts and the delay in the sales. Motions practice resulted in the dismissal of some of the claims. Occidental's breach of contract claim remains. Wells Fargo has filed a counterclaim against Occidental based on the alleged negligence of Occidental's transfer agent, Equiniti Trust

Company, in selling the shares.  Wells Fargo's counterclaim against Equiniti was dismissed for lack of personal jurisdiction.

Occidental has moved for summary judgment to recover on its claims against Wells Fargo and to have Wells Fargo's counterclaim dismissed.  Wells Fargo has moved for summary judgment on its counterclaim against Occidental and to have Occidental's claims dismissed.  The court heard oral argument on the cross motions.

Based on the pleadings; the motions, responses, and replies; the applicable law; the summary judgment record; and the arguments of able counsel, Occidental's motion for summary judgment, (Docket Entry No. 80), is granted as to its claim that Wells Fargo is liable for breach of contract and that Wells Fargo's counterclaim fails and is dismissed.  Wells Fargo's motion for summary judgment is denied.  (Docket Entry No. 81).  Occidental's motion for leave to amend and the motions to seal are granted.  (Docket Entry Nos. 74, 83, 92).  No later than September 9, 2022, the parties must provide a proposed amended scheduling order, agreed upon if possible, to resolve the remaining issues.

The reasons for these rulings are explained below.

## I.      Factual Background

Anadarko, Occidental's predecessor, established the rabbi trust in May 1995 through a Benefits Trust Agreement between Anadarko, as grantor, and Wachovia Bank of North Carolina, N.A., as Trustee.  (Docket Entry No. 80-4 at 1).  Wells Fargo acquired Wachovia in December 2008 and became the Trustee.  (Docket Entry No. 80-4 at 2).  Each benefit arrangement with a Plan Participant is considered a Plan under the Benefits Trust Agreement.  (Docket Entry No. 80-3 at 5).  The Plan Participants were the current or former highly compensated employees and directors of Anadarko who were participating in a Plan, and the current or former directors,

2

employees, and others who were not participating but who were eligible to receive benefits under a Plan.  (Docket Entry No. 80-3 at 8).  Beneficiaries were designated under a Plan to receive benefits in the event of the death of a Participant.  (Docket Entry No. 80-3 at 7).  Federal law required the Plans to remain unfunded pending the payout of benefits, to allow the Plan Participants to defer tax liability.

The Trust Agreement provided that before a change in control, Anadarko could direct the Trustee to acquire, retain, or dispose of investments.  (Docket Entry No. 80-3 at 12).  Anadarko could also direct the Trustee to return to the company assets in excess of 100 percent of the current aggregate accrued obligations under the Plans.  (Docket Entry No. 80-3 at 9).  Anadarko's right to direct the Trustee ended following a change in control.  (Docket Entry No. 80-3 at 12, 24).  When the assets reached more than 125 percent of the current aggregate accrued obligations under the Plans, the successor company could request a disbursement of assets, but the Trustee was not required to make the disbursement.  (Docket Entry No. 80-3 at 9–10).

Occidental acquired Anadarko in August 2019.  This was a change in control under the Trust Agreement.  (Docket Entry No. 80-4 at 3).  When Occidental acquired Anadarko, the Trust held 6.5 million shares of Anadarko common stock and roughly $30 million in cash from accrued dividends on those shares.  (Docket Entry No. 82-4).  Upon closing, each share of the Anadarko stock in the Trust converted to the right to receive .2934 shares of Occidental stock and $59 in cash.  (Docket Entry No. 80-4 at 2).  Following conversion, the Trust held roughly $500 million in assets—1,907,100 shares of Occidental stock, worth about $82 million as of August 31, 2019, and $413 million in cash.  (Docket Entry No. 80-4 at 10, 11; Docket Entry No. 82-5 at 3).

The Trust account was considered a "Top-50" relationship for Wells Fargo.  (Docket Entry No. 80-7).  Wells Fargo's Institutional Retirement and Trust division assigned a three-person team

of professionals to the Trust account: Monique Etheridge as the relationship manager; Terri Montgomery as the client service associate; and Nikki Tanner as the investment manager. (Docket Entry No. 80-5 at 3; Docket Entry No. 80-7 at 4, Docket Entry No. 80-12 at 3). Etheridge was responsible for coordinating client resources, Montgomery was responsible for the Trust's daily operations, and Tanner was responsible for the Trust's asset management and investment strategy. (Docket Entry No. 80-7 at 5; Docket Entry No. 80-12 at 3).

In October 2019, Tanner concluded that roughly $240 million of the almost $500 million held in the Trust needed to be kept in cash to pay out employee benefits and separation agreements in the near term. (Docket Entry No. 80-7 at 10–11). The Plan owed $185 million in future obligations. Tanner intended that the Trust would keep the remaining $73 million in cash. (Docket Entry No. 80-13).

On October 24, 2019, Tanner presented an investment strategy to Occidental. (Docket Entry No. 80-7 at 11; Docket Entry No. 81-1 at 323). Tanner explained the need to sell Occidental stock because it was contrary to Wells Fargo's investment guidelines to have the Trust assets in a single stock. (Docket Entry No. 80-7 at 9). Occidental agreed. (Docket Entry No. 80-7 at 12). Wells Fargo was aware that the sale could trigger tax liability for Occidental, so Wells Fargo asked for Occidental's input. (Docket Entry No. 80-7 at 12). Tanner first reached out to the Occidental team immediately following the October 24, 2019, presentation. (Docket Entry No. 81-1 at 323). She received no response and emailed again in November 2019. (Docket Entry No. 81-1 at 90, 339). On December 10, 2019, Etheridge sent Megan Bruegger, a legacy Anadarko employee, the following email:

Hi Megan,

This email is a follow up to my voice message.

4

Please let Nikki and [me] know when the team has any additional input regarding the sale of Anadarko stock.  If we do not hear from Oxy by 12/17/2019, we will assume that there is no additional input.

(Docket Entry No. 81-1 at 337).

Bruegger forwarded this email to Karen Lippe, who was Occidental's Director of Corporate Accounting and who was involved in the October 2019 discussions, and to Jason Schmitz, who was in the Occidental Treasury Department.  (Docket Entry No. 81-1 at 173–75).  Occidental's representatives explained that they were concerned that a "volume discount" would result if many shares were sold at once, and that the structure and timing of the sale would disrupt the stock market liquidity. (Docket Entry No. 80-15 at 19; Docket Entry No. 80-17 at 6).

On December 16, 2019, Etheridge emailed Schmitz, Lippe, and Bruegger, as follows:

Hi Everyone,

Nikki and I are checking in.  We have not received a response regarding the Oxy team conducting an internal meeting to discuss the liquidation of Oxy stock. Please provide an update.  If we do not receive an update by Wed at 3 PM EST, we will assume there is no additional input and will proceed with the plan that was presented on October 24, 2019.

(Docket Entry No. 96-4 at 2-3).

On December 17, 2019, Schmitz and Jessica Myers from Occidental's Treasury Department spoke with Etheridge and Tanner from Wells Fargo to discuss the liquidation and sale process.  (Docket Entry No. 80-7 at 14).  On December 17, 2019, Schmitz emailed Tanner the following proposal:

Hi Nikki/Monique –
Treasury would appreciate if Wells could agree to a ratable liquidation plan for Oxy Stock as follows:
Beginning January 6, 2020, sell 381,420 shares each day over the course of the week with a final liquidation on January 10, 2020
1,907,100/5 = 381,420
Please let me know if you have any questions or would like to discuss. Regards, Jason.

(Docket Entry No. 80-19).

Tanner wrote back, saying:

Wells Fargo accepts your recommendation for the ratable liquidation plan as follows:

Beginning January 6, 2020, sell 381,420 shares each day over the course of the week with a final liquidation on January 10, 2020.
1,907,100 / 5 = 381,420

(Docket Entry No. 80-32).  Schmitz then replied to Tanner, "Hi Nikki – thanks for accepting the recommendation."  (Docket Entry No. 81-1 at 352).

Tanner testified that, "[a]s representative for Wells Fargo, I understood what was going to happen" after Wells Fargo accepted Occidental's proposal.   (Docket Entry No. 80-7 at 17). Tanner's understanding was to sell the stock in the amounts and on the dates specified.  Bruegger testified that Schmitz was not an "authorized signer" who had authority to make binding decisions for the Occidental relating to the Trust.  (Docket Entry No. 91-1 at 19).  But, as Etheridge testified, "[t]here was a meeting of the minds" between Wells Fargo and Occidental's representatives about the share liquidation.  (Docket Entry No. 80-5 at 20).  The meeting of the minds was to execute the sale of 381,420 shares each day from January 6 to January 10, with a final liquidation on January 10.

This was the largest trade of common stock that Tanner or any Wells Fargo investment manager had handled, as far as Tanner knew.  (Docket Entry No. 80-7 at 19).  Neither Tanner or any other Wells Fargo representative told Occidental of Tanner's inexperience, and Tanner did not ask for help or guidance from any more experienced Wells Fargo employees.  Tanner copied and pasted the text of the email from Schmitz into her calendar as a reminder, and she prepared a spreadsheet detailing the trade amounts and planned dates.  (Docket Entry No. 80-7 at 19).

6

On January 6, 2020, Tanner emailed Wells Fargo's trading desk a five-day order to sell the shares as set out in Schmitz's email. (Docket Entry No. 82-8; Docket Entry No. 82-9). Tanner intended that the shares would be sold as agreed. (Docket Entry No. 80-7 at 20). On January 6, 2020, Wells Fargo sold a full tranche of 381,420 shares at a price of $44.95 per share. (Docket Entry No. 80-4 at 3). On January 7, 2020, Wells Fargo sold only 352,080 shares, instead of the planned 381,420 shares, for a price of $44.75 per share. (Docket Entry No. 80-4 at 3). These were all the shares that Wells Fargo held directly in its Depository Trust Company account. (Docket Entry No. 80-4 at 4). The remaining Trust shares were held by Wells Fargo's transfer agent, Equiniti, in "book-entry" form, through the Direct Registration System. (Docket Entry No. 80-22 at 4). Tanner did not know this fact.

Equiniti is not a brokerage house. Instead, it provides administrative services, such as maintaining a company's share ownership ledger or paying dividends. (Docket Entry No. 80-22 at 4). Equiniti's corporate representative testified that to sell the stock, Wells Fargo should have transferred the shares to its Depository Trust Company account in August 2019. (Docket Entry No. 80-27 at 15). Wells Fargo's standard position is to have "[a]ll the assets that are held on [its] system of record that are eligible to be there" in its Depository Trust Company account. (Docket Entry No. 80-22 at 5). "Industry standard is brokers and banks pull free shares if they are DRS eligible at DTC as soon as they are available into the Depository Trust Company and do not leave it in a registered form." (Docket Entry No. 80-27 at 15). Wells Fargo had not followed its own standard position.

On August 20, 2019, Equiniti notified Wells Fargo that "[y]our shares of Occidental common stock that you received as Merger Consideration are now being held in book-entry form by EQ Shareowner Services." (Docket Entry No. 82-11; Docket Entry No. 82-12). Wells Fargo

7

did not move the shares to the Depository Trust Company before the attempted trades in January 2020. Despite Tanner's position at Wells Fargo and her responsibility for executing the Occidental stock sales for Wells Fargo as Trustee, Tanner did not know that Wells Fargo did not have control over the shares or that Equiniti could not guarantee that the shares would be sold on a specific date. (Docket Entry No. 80-7 at 21; Docket Entry No. 82-13). Tanner did not learn that Equiniti had control until the attempted liquidation on January 7, 2020. (Docket Entry No. 80-7 at 21). Etheridge testified that she did know that Equiniti held these shares, but she admitted that she "totally forgot" that fact when the time came to liquidate them. (Docket Entry No. 80-5 at 27). She did not tell Tanner or another Wells Fargo employee. (Docket Entry No. 80-5 at 27).

Tanner testified that she did not know what the stock's registration coding meant, and she was not trained on the significance of whether stock is held in the Depository Trust Company by a broker or in the Direct Registration position by a transfer agent. (Docket Entry No. 80-7 at 21). Etheridge did not think that it was part of her job to confirm the location of the shares before the sale. (Docket Entry No. 80-5 at 27). Another Wells Fargo supervisor, Tonya Inscore, testified that it was Tanner's responsibility to learn all she could about the account she was going to be managing. (Docket Entry No. 80-28 at 8). Tanner admittedly had not learned facts critical to executing the sales on the timetable Wells Fargo had agreed to follow.

On January 7, 2020, Inscore directed Tanner to sell the shares through a transfer agent. Inscore explained that the remaining shares "are held at the transfer agent. You have to instruct them to sell the shares. . . . [T]he shares were always with a transfer agent." (Docket Entry No. 80-23 at 4–5).

Tanner tried to contact Equiniti on January 7, 2020, but her efforts fell short. She first called the toll-free general customer service line, instead of directly calling the Equiniti

representatives who were assigned to the Occidental account.  (Docket Entry No. 80-49).  She was told that it could take five business days to complete a sale and that Equiniti could not do same-day sales or guarantee any specific liquidation schedule.  (Docket Entry No. 80-49).  Tanner then faxed Equiniti an instruction to sell 29,340 shares to complete selling that day's tranche of 381,420 shares.  (Docket Entry No. 80-31).

Tanner called the customer service line again on January 8, 2020, again bypassing the Equiniti representatives assigned to the account.  Tanner was told that her Transaction Request was "still active, so it's still being processed . . . but it looks like it might not be accepted" because of a missing notarization.  (Docket Entry No. 80-55).  Equiniti reviewed the request again and sold the 29,340 shares.  (Docket Entry No. 80-27 at 7–8).  Equiniti did not tell Tanner that the first request had been accepted, and neither Tanner nor anyone else at Wells Fargo made any effort to confirm the status of the Transaction Request.  Instead, without checking, Wells Fargo sent a second Transaction Request to Equiniti to sell 29,340 shares.  (Docket Entry No. 80-7 at 27; Docket Entry No. 82-18).  Equiniti sold another 29,340 shares on January 10, 2020.  (Docket Entry No. 80-4 at 4).

Tanner emailed Montgomery and Etheridge on January 8, stating: "I need to sell all shares."  (Docket Entry No. 82-26 at 3).  In another January 9 submission, Wells Fargo grouped together three identical Transaction Requests for 381,420 shares—1,144,260 shares in total—to complete the liquidation.  (Docket Entry No. 82-21).  But because Equiniti had already processed two orders to sell 29,340 shares, only 1,114,920 shares remained, so Equiniti rejected the three Transaction Requests.  (Docket Entry No. 80-7 at 33).  On January 9, 2020, Tanner emailed Montgomery and Etheridge again, stating:  "I know at this point we have no control over how and when the shares are sold but I thought it would be worthwhile to try."  (Docket Entry No. 82-26 at

3). Equiniti issued checks to Wells Fargo that reflected the proceeds from the two duplicate sales. Neither Tanner nor anyone else at Wells Fargo noticed that Equiniti had fulfilled the initial sales order twice. (Docket Entry No. 80-12 at 8; Docket Entry No. 80-7 at 32).

Equiniti mailed a letter to Wells Fargo's address of record on January 16, 2020, explaining that multiple requests have been received" and asked Wells Fargo to "[p]lease clarify the total number of shares you would like to sell." (Docket Entry No. 82-25 at 1). The letter was left unopened on Terri Montgomery's desk at Wells Fargo for a month. (Docket Entry No. 80-12 at 7). No one at Wells Fargo followed up until Tanner finally called Equiniti on February 14, 2020. At that point, Tanner still did not know that the shares had not been sold. (Docket Entry No. 80-57 at 8). Tanner testified that:

> [w]e did not know that [Equiniti had rejected the sale]….So I put in the request and the check went to Winston-Salem and I received notice, 'Hey, these two checks came in and they've been deposited,' but no one told me this one had been rejected. ... I'm concerned that – that – and it has nothing to do with you. I'm just concerned that on our side that no one on the team raised the hand to say, 'Hey, this got rejected. Do we need to re-send that?'…. If I hadn't put this call in, I don't think anyone would have known.

(Docket Entry No. 80-57 at 8–10). On February 18, 2020, Wells Fargo finally found the unopened letter from Equiniti asking for clarification in a stack of apparently ignored mail on Montgomery's desk. (Docket Entry No. 80-7 at 37).

The Wells Fargo Trust service team did not know that it could transfer shares from Equiniti to the Depository Trust Company. Tanner testified that she believed the trading was "out of Wells Fargo's hands because now we are behold[en] to this form that we have to overnight to Equiniti." (Docket Entry No. 80-7 at 29). Tanner prepared a new Transaction Request letter on February 18, 2020, asking Equiniti to sell all of the remaining shares. But Inscore, a Wells Fargo supervisor, refused to approve the letter without first receiving an updated account statement from Equiniti

showing the January sales.  (Docket Entry No. 80-7 at 37–38; Docket Entry No. 80-28 at 10).  This caused further delay.  (Docket Entry No. 80-7 at 38).

On February 26, 2020, Occidental and Wells Fargo held a quarterly investment review meeting and discussed the delayed sales.  (Docket Entry No. 80-7 at 38).  Occidental arranged a call with Equiniti and Wells Fargo, and Equiniti recommended that Wells Fargo transfer the shares to the Depository Trust Company and sell them.  (Docket Entry No. 80-46 at 5; Docket Entry No. 80-7 at 38–39).  Tanner emailed internally to confirm that this was possible.  (Docket Entry No. 80-7 at 38–39).  On March 9, 2020, Tanner emailed that she needed help to make Wells Fargo the registered custodian for the remaining shares.  (Docket Entry No. 82-29 at 7).  On March 16, 2020, Tanner emailed her colleagues suggesting that they should revisit the liquidation plan that Wells Fargo had agreed to implement, given Wells Fargo's delay in selling the shares and the ensuing market downturn.  (Docket Entry No. 82-31 at 3).  On March 17, 2020, Wells Fargo submitted the instructions to have the shares transferred to its Depository Trust Account to be sold.  (Docket Entry No. 82-30).  On March 18, 2020, the shares were transferred.  (Docket Entry No. 82-30).  Therese Brown, the Wells Fargo employee who carried out the transfer, testified that it was an "easy," "straightforward," "familiar," and "standard DRS transfer."  (Docket Entry No. 80-22 at 8–10).  On March 20, 2020, Wells Fargo sold the remaining 1,114,920 shares at $9.98 per share in a block sale.  (Docket Entry No. 80-4).

The market improved in 2020, and the value of the reinvested assets in the Trust grew throughout the rest of the year.  The Trust made all benefits payments to Plan Participants in 2020, and the value of the assets in the Trust on December 31, 2020, exceeded 125% of the then current aggregate accrued obligations under the Plans.  (Docket Entry No. 81-1 at 220–23).  The reimbursement claims Occidental made in 2020 were paid.  (Docket Entry No. 81-1 at 222).  In

April 2021, shortly after this lawsuit was filed, Wells Fargo transferred $23,696,213.01 to Occidental as a discretionary disbursement of excess assets.  (Docket Entry No. 80-4 at 4).

## II.       The Motion for Leave to Amend

Occidental and Anadarko seek leave to file a third amended complaint to clarify that Anadarko is an injured party under the agreements and to allege that Wells Fargo breached the Trust Agreement, in addition to breaching the contract formed in the December 2019 emails in which Wells Fargo agreed to sell the shares on the timetable and in the amounts Occidental had recommended.  (Docket Entry No. 74).  The second amended complaint alleged that Wells Fargo breached contractual duties owed to both Occidental and Anadarko and added Anadarko as an intervening plaintiff, but it did not consistently refer to Anadarko as an injured party under the agreements.  (Docket Entry No. 62).

Wells Fargo argues that the plaintiffs' proposed Third Amended Complaint "introduces an entirely new claim by adding a sentence that alleges that Wells Fargo breached not one contract, as currently pled, but two contracts: 'Wells Fargo's failure to timely sell the Occidental shares also breached the Trust Agreement.'"  (Docket Entry No. 98 at 4).  Wells Fargo argues that the Third Amended Complaint adds allegations about the breach of sections 1.5 and 5.5 of the Trust Agreement that were not previously pleaded as part of Occidental's and Anadarko's breach of contract claim.  Wells Fargo argues that allowing the third amended complaint to proceed would cause prejudice because the parties have already completed extensive discovery and filed dispositive motions, the amendment is a futile attempt to resurrect the previously dismissed claim for breach of fiduciary duty, and there is no good cause for the late amendment.

Federal Rule of Civil Procedure 15(a) provides that leave to amend pleadings "shall be freely given when justice so requires."  Rule 15 "evinces a bias in favor of granting leave to

amend." *Jones v. Robinson Prop. Grp., L.P.*, 427 F.3d 987, 994 (5th Cir. 2005) (citations omitted).

"A district court must possess a 'substantial reason' to deny a request for leave to amend, but 'leave

to amend is by no means automatic.'" *Id.* (citation and quotations omitted). "The policy of the

federal rules is to permit liberal amendment to facilitate determination of claims on the merits and

to prevent litigation from becoming a technical exercise in the fine points of pleading." *Dussouy*

*v. Gulf Coast Inv. Corp.*, 660 F.2d 594, 597–98 (5th Cir. 1981).

The second amended complaint outlines Wells Fargo's duties under the Benefits Trust

Agreement and alleges breaches of those obligations. The Second Amended Complaint alleges

that:

- At all times, when Wells Fargo accepted an instruction to sell securities, the Trust Agreement and applicable law obligated it to execute that sale timely and at the market price, in accordance with the directions to sell it had received, a service for which it was fully compensated under Section 5.7. The Trust Agreement was amended at various times thereafter, but none of the amendments divested Wells Fargo of its obligation to execute sales instructions it had accepted timely and at the market price.

- **Wells Fargo was also obligated under [the] Trust Agreement Section 5.5 and under applicable law** to execute the trade prudently, competently, and on the dates specified, at the prevailing market prices, so as to ensure that the shares were liquidated as and when Wells Fargo had agreed to liquidate them. **Wells Fargo breached all of these obligations.**

- Wells Fargo's failure to inquire and act swiftly in January to remedy its failure to sell the shares as it had agreed was another breach of the Trustee's duties under the Trust Agreement and a breach of its agreement with Occidental to sell the shares timely and on the dates specified.

- Having agreed and undertaken the obligation to timely sell all of the shares . . . it was Wells Fargo's obligation at law and under the Trust Agreement to ensure it had all the shares in hand and ready to sell as of the date the sales were to begin.

(Docket Entry No. 62 at 5, 7, 10) (emphasis added).

Wells Fargo's argument that Occidental failed to allege in the Second Amended Complaint that Wells Fargo breached its obligations under both the Trust Agreement and the December 2019 email contract is unpersuasive. Occidental clearly pleaded both breaches. Indeed, Wells Fargo argued in an earlier motion to dismiss that there were breach of contract claims arising from both the Trust Agreement and the December 2019 emails. "As an initial matter, the Trust Agreement governs the precise subject matter of this dispute, and its text is contrary to the purported 'contract' that Occidental alleges the parties created via an exchange of correspondence." (Docket Entry No. 11 at 10). Wells Fargo did not object at the hearing on the motion to dismiss to the allegations that there were two bases for the breach of contract claim. (Docket Entry No. 80-2 at 47, 55). Wells Fargo did not move to dismiss the breach of contract claim on either basis. The third amended complaint reflects the breach of contract theories that both sides have recognized. Wells Fargo has not shown that it was unable to fully discover the grounds for the breach of contract claims or shown that it would otherwise be prejudiced by the amendment.

Occidental's motion for leave to amend is granted. (Docket Entry No. 74).

## III.   The Motion to Seal

Wells Fargo moves to seal certain materials that contain confidential financial information, consistent with the terms of the parties' agreed protective order. (Docket Entry Nos. 83, 92). Both parties designated discovery materials as confidential under the protective order. There is no opposition to the motion.

Despite the public's "general right to inspect and copy public record," a court may order documents sealed where, on balance, the party's interest in having them sealed outweighs the public's interest in open access to judicial records. *Seals v. Herzing Inc.-New Orleans*, 482 F. App'x 893, 896 (5th Cir. 2012) (the district court did not abuse its discretion by concluding that

the parties' agreement to seal the documents and the importance of keeping the materials sealed outweighed the public's interest in the records).  Courts in this circuit have sealed documents to prevent the disclosure of confidential business information.  *See, e.g.*, *Doe v. A Corp.*, 709 F.2d 1043, 1045 (5th Cir. 1983) (noting the district court granted a motion to seal documents "to prevent possible disclosure of confidential information concerning [a company's] affairs"); *Decapolis Grp., LLC v. Mangesh Energy, Ltd.*, No. 3:13-CV-1547-M, 2014 WL 702000, at *2 (N.D. Tex. Feb. 24, 2014) (granting a motion to seal an arbitration award in part to protect sensitive business information such as strategic data).

The parties seek to protect confidential business information and have agreed to the protective order.  The court grants the motions to seal.  (Docket Entry No. 83, 92).

## IV.   The Summary Judgment Standard and Evidence

### A.   The Summary Judgment Standard

"Summary judgment is appropriate only when 'the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Shepherd ex rel. Est. of Shepherd v. City of Shreveport*, 920 F.3d 278, 282–83 (5th Cir. 2019) (quoting Fed. R. Civ. P. 56(a)).  "A material fact is one that might affect the outcome of the suit under governing law," and "a fact issue is genuine if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Renwick v. PNK Lake Charles, LLC*, 901 F.3d 605, 611 (5th Cir. 2018) (citations and internal quotation marks omitted).  The moving party "always bears the initial responsibility of informing the district court of the basis for its motion," and identifying the record evidence "which it believes demonstrate[s] the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

"When the moving party has met its Rule 56(c) burden, the nonmoving party cannot survive a summary judgment motion by resting on the mere allegations of its pleadings." *Duffie v. United States*, 600 F.3d 362, 371 (5th Cir. 2010).   The nonmovant must identify specific evidence in the record and articulate how that evidence supports that party's claim. *Willis v. Cleco Corp.*, 749 F.3d 314, 317 (5th Cir. 2014).   "A party cannot defeat summary judgment with conclusory allegations, unsubstantiated assertions, or only a scintilla of evidence." *Lamb v. Ashford Place Apartments LLC*, 914 F.3d 940, 946 (5th Cir. 2019) (citation and internal quotation marks omitted).   In deciding a summary judgment motion, "the evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his or her favor." *Waste Mgmt. of La., LLC v. River Birch, Inc.*, 920 F.3d 958, 972 (5th Cir. 2019) (alterations omitted) (quoting *Tolan v. Cotton*, 572 U.S. 650, 656 (2014)).

When the parties cross-move for summary judgment, the court must review "each motion independently, viewing the evidence and inferences in the light most favorable to the nonmoving party." *Mid–Continent Cas. Co. v. Bay Rock Operating Co.*, 614 F.3d 105, 110 (5th Cir. 2010) (alteration omitted) (quotation marks omitted).   The moving party bears a heavier burden when seeking summary judgment on a claim or defense on which it would bear the burden of proof at trial. *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1194 (5th Cir. 1986).   In that case, it "must establish beyond peradventure *all* of the essential elements of the claim or defense to warrant [summary] judgment in [its] favor." *Id.* (emphasis in original).   "If the moving party fails to meet this initial burden, the motion must be denied, regardless of the nonmovant's response." *Meecorp Capital Mkts.,* 265 F. App'x 155, 158 (quoting *Little v. Liquid Air Corp.,* 37 F.3d 1069, 1075 (5th Cir. 1994)).   When the nonmoving party raises an affirmative defense, the moving party must first show that there is no genuine issue of material fact as to that defense.   If

the moving party meets its initial burden, the nonmoving party must point to "admissible evidence legally sufficient to sustain a finding favorable . . . on each element of that defense." *Exxon Corp. v. Oxxford Clothes, Inc.*, 109 F.3d 1070, 1074 (5th Cir. 1997).

**B.     The Summary Judgment Evidence**

Occidental submitted the follow evidence in support of the motion for summary judgment and its response to Wells Fargo's motion for summary judgment:

- a monthly invoice dated Oct. 11, 2019, (Docket Entry No. 80-1);

- excerpts from November 5, 2021 Hearing Transcript, (Docket Entry No. 80-2);

- the Benefits Trust Agreement, (Docket Entry No. 80-3);

- a Joint Statement of Stipulated Facts, (Docket Entry No. 80-4);

- excerpts from Deposition of Monique Etheridge, dated May 6, 2022, (Docket Entry No. 82-1; Docket Entry No. 95-7);

- a Trust Agreement Fee Schedule dated Sept. 1, 2019, (Docket Entry No. 80-6);

- excerpts from Deposition of Nikki Tanner, dated May 3, 2022, (Docket Entry No. 80-7; Docket Entry No. 95-10);

- the First Quarter Invoice dated April 7, 2020, (Docket Entry No. 82-2);

- the Second Quarter Invoice dated July 16, 2020, (Docket Entry No. 82-3);

- the July 2019 Trust Statement, (Docket Entry No. 82-4);

- the August 2019 Trust Statement, (Docket Entry No. 82-5);

- excerpts from Deposition of Terri Montgomery, dated April 13, 2022, (Docket Entry No. 80-12);

- the Anadarko Benefits Trust Spreadsheet, (Docket Entry No. 80-13);

- an email from N. Tanner to M. Bruegger, Karen Lippe, and Monica Etheridge, dated Oct. 25, 2019, (Docket Entry No. 82-6);

- excerpts from the deposition of Jason A. Schmitz, dated April 18, 2022, (Docket Entry No. 80-15; Docket Entry No. 95-14);

17

- excerpts from the deposition of Karen Lippe, dated March 28, 2022, (Docket Entry No. 80-16);

- excerpts from the deposition of Jessica Myers, dated March 30, 2022, (Docket Entry No. 80-17; Docket Entry No. 95-17);

- an OXY Stock Trading Analysis dated Dec. 17, 2019, (Docket Entry No. 80-18);

- an email thread between J. Schmitz and N. Tanner, et al., dated Dec. 19, 2019, (Docket Entry No. 82-7);

- a Liquidation Spreadsheet detailing Jan. 6-10, 2020 stock sales, (Docket Entry No. 82-8);

- a Trade Order dated Jan. 6, 2020, (Docket Entry No. 82-9);

- excerpts from the deposition of Therese A. Brown, dated April 26, 2022, (Docket Entry No. 80-22);

- an email thread between K. Ly and N. Tanner and others dated January 7, 2020, (Docket Entry No. 82-10);

- Wells Fargo's Response to EQ's Interrogatory No. 2 dated May 31, 2022, (Docket Entry No. 80-24);

- an EQ statement dated Aug. 20, 2019, (Docket Entry No. 82-11);

- an email from EQ's A. Elfstrom to T. Inscore and others dated Aug. 21, 2019, (Docket Entry No. 82-12);

- excerpts from the deposition of Kathryn Sevcik, dated April 28, 2022, (Docket Entry No. 80-27);

- excerpts from the deposition of Tonya Inscore, dated May 10, 2022, (Docket Entry No. 80-28);

- a "chat" between N. Tanner and M. Etheridge dated Jan. 7, 2020, (Docket Entry No. 82-13);

- an email thread from T. Inscore to L. Dahle dated August 20, 2019, (Docket Entry No. 82-14);

- a Transaction Request dated Jan. 7, 2020, (Docket Entry No. 82-15);

- a transcript of a January 8, 2020 call from N. Tanner to EQ, (Docket Entry No. 80-32);

- an EQ Order Processing Log dated Jan. 8-10, 2020, (Docket Entry No. 82-16);

- an EQ Sale Processing Information dated Jan. 7-14, 2020, (Docket Entry No. 82-17);

- a Transaction Request dated January 9, 2020, (Docket Entry No. 82-18);

- an EQ Sale Processing Information form dated January 9-15, 2020, (Docket Entry No. 82-19);

- an EQ Check to Wells Fargo dated January 10, 2020 sale, payable Jan. 15, (Docket Entry No. 82-20);

- a Transaction Request dated January 9, 2020, (Docket Entry No. 82-21);

- a "Liquidate Oxy" reminder for January 6-10, 2020, created December 19, 2019, (Docket Entry No. 82-22);

- a Jan. 2020 Trust Statement, (Docket Entry No. 82-23);

- a Change of Control Best Practices, (Docket Entry No. 82-24);

- a recording of a February 14, 2020, call from N. Tanner to EQ, (Docket Entry No. 80-42);

- a sale-request rejection letter from EQ to Wells Fargo dated January 16, 2020, (Docket Entry No. 82-25);

- an email thread between N. Tanner and M. Russell, et. al, dated Feb. 18, 2020, (Docket Entry No. 82-26);

- a Transaction Request dated Feb. 18, 2020, (Docket Entry No. 82-27);

- excerpts from the deposition of Elizabeth Hyatt Gooch, dated March 29, 2022, (Docket Entry No. 80-46);

- an email thread between E. Gooch and N. Tanner and others dated February 26, 2020, (Docket Entry No. 82-28);

- an email thread between N. Tanner and M. Russell and others dated March 12, 2020, (Docket Entry No. 82-29);

- a recording of a January 7, 2020 call from Tanner to EQ, (Docket Entry No. 80-49);

- an email thread between T. Brown and N. Tanner and others dated March 18, 2020, (Docket Entry No. 82-30);

- an email thread between N. Tanner and J. Mason dated March 20, 2020, (Docket Entry No. 82-31);

- a transcript of a January 7, 2020, call from Tanner to EQ, (Docket Entry No. 80-52);

- a chat between N. Tanner and M. Etheridge dated March 16, 2020, (Docket Entry No. 82-32);

- a Sale Order from N. Tanner dated March 20, 2020, (Docket Entry No. 82-33);

- a recording of Jan. 8, 2020 call from N. Tanner to EQ, (Docket Entry No. 80-55);

- an EQ Check to Wells Fargo dated January 9, 2020, payable on January 14, (Docket Entry No. 82-34);

- a transcript of a February 14, 2020, call from N. Tanner to EQ, (Docket Entry No. 80-57);

- emails between T. Montgomery and N. Tanner dated February 14, 2020, (Docket Entry No. 82-35);

- emails between N. Tanner and M. Russell and others dated February 28, 2020, (Docket Entry No. 82-36);

- a recording of a March 12, 2020, call from N. Tanner to EQ, (Docket Entry No. 80-60);

- a transcript of a March 12, 2020, call from N. Tanner to EQ, (Docket Entry No. 80-61);

- an email thread between N. Tanner and J. Myers and others, dated February 5, 2020, (Docket Entry No. 80-61);

- an email from M. Etheridge to A. Frazier, dated December 20, 2019, (Docket Entry No. 95-23);

- chat between N. Tanner and M. Etheridge, dated December 19, 2019, (Docket Entry No. 95-24); and

- the plaintiffs' Rule 30(b)(6) Deposition Notice to Wells Fargo, (Docket Entry No. 95-25).

Wells Fargo submitted evidence in support of its motion for summary judgment and in response to Occidental's motion for summary judgment, as follows:

- the joint statement of stipulated facts;

- Wells Fargo's Shareowner Services Transfer Agent Agreement;

- the Purchase and Assumption Agreement;

- the Notice of Change in Control dated August 8, 2019;

- an email exchange dated October 2019;

- an email exchange dated December 17-19, 2019;

- a table of historical stock prices;

- a reversion request dated April 12, 2021;

- a reversion response dated April 21, 2021;

- excerpts from the deposition of Jason Schmitz, dated April 18, 2022;

- excerpts from the deposition of Megan Bruegger, dated February 16, 2022;

- excerpts from the deposition of Jessica Myers, dated March 30, 2022;

- excerpts from the deposition of Nikki Tanner, dated May 3, 2022;

- excerpts from the deposition of Karen Lippe, dated March 28, 2022;

- excerpts from the deposition of Elizabeth Gooch, dated March 29, 2022;

- the Anadarko Petroleum Benefits Trust Agreement

- email correspondence dated July 31 to August 1, 2019;

- email correspondence dated August 8, 2019;

- email correspondence dated October 22, 2019;

- email correspondence dated October 25, 2019;

- email correspondence dated December 10, 2019;

- internal Occidental correspondence dated December 12, 2019;

- email correspondence dated December 10-17, 2019;

- email correspondence dated October 25-November 21, 2019;

- email correspondence dated December 10, 2019;

- email correspondence dated December 10-16, 2019;

- email correspondence dated December 10-19, 2019;

- email correspondence dated February 5, 2020;

- email correspondence dated January 31, 2020;

- the First Amendment to the Anadarko Petroleum Corporation Benefits Trust Agreement;

- the Second Amendment to the Anadarko Petroleum Corporation Benefits Trust Agreement;

- email correspondence dated March 26-May 2, 2020;

- email correspondence dated April 6, 2021;

- internal correspondence between Monique Etheridge and Nikki Tanner, dated December 19, 2019;

- excerpts from the deposition of Monique Etheridge;

- excerpts from the deposition of Stephen Eubank;

- excerpts from the deposition of Kathryn Sevcik;

- internal correspondence dated January 15-16, 2020;

- correspondence from Shareholder Communications, dated January 16, 2020;

- Occidental Petroleum corporation transaction requests; and

- a slip-sheet for a January 13, 2020, telephone call.

(Docket Entry No. 81-1; Docket Entry No. 91-1).

V.    **The Summary Judgment Motions**

Occidental moved for summary judgment on its claims that Wells Fargo breached the Trust Agreement and the contract that was formed through the email exchanges in December 2019. Wells Fargo argues that the facts are undisputed and, as a matter of law, do not show a breach of contact.   Wells Fargo argues in the alternative that there are factual disputes material to determining whether a contract was formed by email in December 2019, whether Wells Fargo breached that contract, and whether Occidental suffered damages.

If the facts are undisputed, a court determines contract formation.  *X Techs., Inc. v. Marvin Test Sys., Inc.*, 719 F.3d 406, 414 (5th Cir. 2013).  A court also determines what a contract means unless it is ambiguous.  *D.E.W., Inc. v. Local 93, Laborers' Int'l Union*, 957 F.2d 196, 199 (5th Cir. 1992).  The fact that parties may disagree about what a contract requires does not make the contract ambiguous.  *REO Indus., Inc. v. Natural Gas Pipeline Co. of America*, 932 F.2d 447, 453 (5th Cir. 1991).  "The primary concern of a court in construing a written contract is to ascertain the true intent of the parties as expressed in the instrument. If a written contract is so worded that it can be given a definite or certain legal meaning, then it is not ambiguous."  *Nat'l Fire Ins. Co. of Pittsburgh, Pa. v. CBI Indus.*, 907 S.W.2d 517, 520 (Tex. 1995).  However, if the court finds the contract to be ambiguous, summary judgment is not proper because its interpretation becomes a question of fact for the jury.  *Fireman's Fund Ins. Co. v. Murchison*, 937 F.2d 204, 207 (5th Cir. 1991).  "'The court determines what conduct is required by the parties,' and, to the extent the parties dispute whether or not they have performed that conduct, the court submits that factual dispute to the jury."  *X Techs., Inc.*, 719 F.3d at 413–14 (quoting *Meek v. Bishop Peterson & Sharp, P.C.*, 919 S.W.2d 805, 808 (Tex. App.—Houston [14th Dist.] 1996, writ denied)).

Under Texas law, the elements of a breach of contract are (1) existence of a valid contract, (2) the plaintiff performed or tendered performance, (3) the defendant breached the contract, and (4) the plaintiff suffered damages because of that breach. *Case Corp. v. Hi-class Bus. Sys. Of Am., Inc.*, 184 S.W.3d 760, 769 (Tex. App.—Dallas 2005, pet. denied).

### A.      The Breach of the Trust Agreement

Occidental argues that the Trust Agreement is a valid contract, under which Wells Fargo agreed to prudently invest the funds held in the Trust, and that Wells Fargo breached this agreement by failing to timely sell the Occidental shares in January 2020.  Occidental points to the provisions requiring that Wells Fargo:

- "invest and reinvest part or all of the Trust Fund in any real or personal property";

- "diversify such investments so as to minimize the risk of large losses unless under the circumstances it is clearly prudent not to do so," (Docket Entry No. 80-3 at § 5.5(a));

- "retain in cash such amounts as the Trustee considers advisable," (Docket Entry No. 80-3 at § 5.5(b));

- "invest and manage trust assets as a prudent investor would" and in so doing, "exercise reasonable care, skill, and caution," (Docket Entry No. 80-3 at § 5.5); TEX. PROP. CODE § 117.004(a);

- "manage, sell, … and otherwise deal with all real and personal property held by the Trustee on such terms and conditions as the Trustee shall decide," (Docket Entry No. 80-3 at § 5.5(c)); and

- "perform all other acts which, in the Trustee's judgment, are appropriate for the proper management, investment, and distribution of the Trust Fund to the extent such duties have not been assigned to others as provided herein;" Docket Entry No. 80-3 at § 5.5(n)).

Occidental argues that Wells Fargo recognized that it was at least prudent to sell the Occidental shares to diversify the Trust holdings.  Occidental also argues that Wells Fargo agreed to carry out Occidental's recommended liquidation plan because it was at least prudent to avoid a

single huge sale that could depress the market price.  Wells Fargo did not, however, sell the shares when prudence had led to its agreement to do so.  (Docket Entry No. 80-4 at 3–4; Docket Entry No. 80-7 at 20).

Wells Fargo responds that the Trust Agreement did not impose contractual duties but instead imposed only the fiduciary obligations of a Trustee.  Wells Fargo argues that those duties are the general duties of prudent trust management imposed by the Texas Property Code and common law, duties that cannot give rise to a common-law breach of contract claim.

As noted above, Wells Fargo's argument that the Trust Agreement is not a contract is inconsistent with the position it has taken throughout this litigation.  For example, at the hearing on the motions to dismiss, counsel had the following exchange with the court:

| | |
|---|---|
| Counsel: | "Your Honor, there is no fiduciary duty owed to Wells Fargo." |
| The court: | "What is the duty?" |
| Counsel: | "The duty would be the contractual duties that are set forth in the Trust Agreement[.]" |

(Docket Entry No. 80-2 at 5).

Wells Fargo points to cases holding that beneficiaries cannot bring breach of contract claims based on a fiduciary relationship.  *See e.g.*, *Harry & Jeanette Weinberg Found. Inc. v. ANB Inv. Mgt. & Tr. Co.*, No. 97 C 4362, 1997 WL 652342, at *4 (N.D. Ill. Oct. 10, 1997) (a beneficiary could not bring a claim for breach of contract based on a trust agreement because the relationship was governed by the law of fiduciary duties).  This court earlier ruled that Wells Fargo did not owe the plaintiffs fiduciary duties, and that the parties' relationship was governed by the Trust Agreement as a contract.  And even if there is no breach of contract claim for an allegation that a defendant trustee generally breached fiduciary duties, courts allow claims for breach of trust agreements when the alleged breach arises from failing to execute or implement a specific decision, rather than a breach of fiduciary duties generally.  *See, e.g., Thompson ex rel. Thorp*

25

*Family Charitable Remainder Unitrust v. Federico*, 324 F. Supp. 2d 1152, 1167–69 (D. Or. 2004) (a plaintiff could bring a breach of contract claim but not a breach of fiduciary duty claim when the parties had signed an agreement "sharply proscribing the exercise of independent judgment" by the trust manager).  Although Wells Fargo had discretion under the Trust Agreement, its discretion was constrained by the duties imposed in that Agreement as well as by its agreement in the email exchange to accept and implement Occidental's recommendation on when to sell certain numbers of shares.  Wells Fargo has not pointed to evidence showing genuine factual disputes material to determining that the Trust Agreement was a binding contract between the parties that, in itself and in combination with other documents, imposed specific contractual duties on Wells Fargo.

Wells Fargo argues that there are genuine factual disputes material to determining whether time was of the essence of any contract because Occidental: (1) delayed providing input about the sale for months; (2) Schmitz testified that his concern was the trading volume and liquidity, not the expected market price on a certain date; and (3) Occidental did nothing after learning on January 31, 2020, that the sales had not been completed as Wells Fargo had agreed, until it filed this suit.

Occidental points to the five specific sales dates that were listed in Schmitz's email— January 6 to 10, 2020—and points to the testimony that both Occidental and Wells Fargo fully intended the sales to occur on those dates to "get out as soon as practicable" from the risky Occidental stock concentration in the Trust.  (Docket Entry No. 80-16 at 5).  Schmitz testified that Occidental was concerned with market liquidity around the holidays and "the thought was that we were looking to the earliest date where liquidity would return to the market."  (Docket Entry No. 80-16 at 5).  Tanner testified that on January 7, 2022, when she realized that she could not trade

the shares on the planned timetable, she felt time was of the essence.  (Docket Entry No. 80-7 at 26).

Even if Occidental had been relatively indifferent to the specific dates for stock sales before its email recommendation and Wells Fargo's agreement in December 2019, and even if before that agreement Wells Fargo had discretion as to whether and when to sell the shares in the Trust, Wells Fargo *agreed* to use that discretion to make specific sales on five specific dates in January 2020. Wells Fargo communicated that agreement to Occidental.  Wells Fargo has not pointed to any record evidence creating a factual dispute material to determining that the sales amounts and dates were part of Wells Fargo's agreement communicated to Occidental in the December 19, 2019, email.  Wells Fargo breached its agreement to sell the shares on the dates specified.  Even if Wells Fargo's evidence did support an inference that the specific dates in January were immaterial to Occidental—which the record refutes—factual disputes as to whether a breach is material cannot defeat summary judgment on a breach of contract claim.  "[S]ettled Texas law regarding the elements of a contract claim . . . requires a finding of breach, not a finding of material breach." *See Bartush-Schnitzius Foods Co. v. Cimco Refrigeration, Inc.*, 518 S.W.3d 432, 436 (Tex. 2017). Nor do disputes as to whether Equiniti exacerbated the delay in selling the stock by poor communications between Wells Fargo and Equiniti starting on January 7, 2020, create a factual dispute material to determining that Wells Fargo breached its agreement to sell all the shares in specific increments between January 6 and January 10, 2020.

Wells Fargo also has not pointed to any evidence showing factual disputes material to determining that it breached the agreement to sell the shares in the specified amounts and on the specified dates.  On January 6, 2020, Tanner emailed Wells Fargo's trading desk a five-day order to sell the shares as specified in Schmitz's email.  (Docket Entry No. 82-8; Docket Entry No. 82-

9).  Tanner intended to sell the shares as and when Wells Fargo had agreed to do so.  (Docket Entry No. 80-7 at 20).  Tanner did not know that because of the way Wells Fargo held the shares, it did not have control over them and could not sell them as Tanner had specified in the five-day order. (Docket Entry No. 7 at 21).  This does not create a factual dispute as to whether Wells Fargo failed to perform as agreed.  It did.

The fact that Wells Fargo had discretion as a Trustee under the Trust Agreement on when and what to sell from the Trust is consistent with the undisputed evidence in the record that Wells Fargo exercised that discretion by committing to sell the stock in specified tranches on specified dates.  Indeed, the record shows that Wells Fargo accepted Occidental's recommendation to execute the sales in this fashion in Wells Fargo's role as a prudent Trustee under the Trust Agreement.  The undisputed evidence shows Wells Fargo decided to diversify Occidental's portfolio and hold only enough cash to meet the Trust obligations under the relevant benefit Plans. These decisions were made within the scope of Wells Fargo's responsibilities under § 5.5(a) and § 5.5(n) of the Trust Agreement, as well as other duties imposed by law under § 5.5.  "Other duties" includes the "prudent investor" provision under the Texas Property Code §§ 117.001–117.012. Under § 117.004(a), "[a] trustee shall invest and manage trust assets as a prudent investor would, by considering the purposes, terms, distribution requirements, and other circumstances of the trust."  Wells Fargo agreed to diversify by selling the Occidental stock, and agreed to do so on the dates specified to reduce the risk of selling all the stock at once, and to reduce the risk of extending the sale dates too far into the uncertain future.  Wells Fargo has not shown that there are factual disputes material to determining that it breached because the evidence indisputably shows that Wells Fargo believed it urgently needed to diversify the Trust holdings, recommended that to Occidental, agreed to accept Occidental's recommendation as to when to sell the shares, but failed

to execute the sales as agreed.  Wells Fargo did not reconsider its decision not to sell the shares; through a series of clumsy missteps, it simply failed to do so.  In short, Wells Fargo failed to implement what it agreed to do to prudently manage the Trust, in breach of its obligations under the Trust Agreement.

B.     **The Breach of the Email Contract**

Occidental argues that Wells Fargo's failure to sell the shares as it had agreed not only breached its contractual duties under the Trust Agreement, but also breached the contract formed when Wells Fargo agreed to sell the Occidental stock by accepting Schmitz's proposal on December 19, 2019.  Occidental argues that Schmitz offered the liquidation plan by email on December 17, 2019, Wells Fargo accepted that plan on December 19, 2019, there was a meeting of the minds on the terms of the liquidation, the agreement was signed by Tanner electronically, and Wells Fargo followed up the email exchange by preparing to and attempting to carry out the agreement, failing to do so only because of its own missteps.

Etheridge, the relationship manager, testified that "[t]here was a meeting of the minds. I can agree to that." (Docket Entry No. 91-1 at 50).  Wells Fargo responds that when read in context, Etheridge's testimony shows that she did not think that Wells Fargo needed Occidental's input on a proposal to sell the shares in the Trust but instead sought that input as a courtesy, and that Wells Fargo never intended to relinquish the discretion provided under the Trust Agreement. (Docket Entry No. 91-1 at 45).  Wells Fargo points to Bruegger's testimony that Schmitz did not have authority to bind Occidental or Anadarko.  (Docket Entry No. 91-1 at 19).  Wells Fargo then argues that even if Schmitz's email was an offer, Tanner responded to the email that she was accepting it as a "recommendation," which makes her response a rejection and a counteroffer.  Wells Fargo argues that Occidental's subsequent failure to check on the sales or follow up with Wells Fargo

29

when Occidental became aware of the delay in the sales shows that Occidental did not understand the email exchange as Wells Fargo's binding agreement to sell the specified amounts on the specified dates.  The court addresses each of these arguments in turn.

The exchange of emails between Tanner and Schmitz on December 19, 2019, shows an agreement that "[b]eginning January 6, 2020," Wells Fargo would sell "381,420 shares each day over the course of the week with a final liquidation on January 10, 2020."  (Docket Entry Nos. 80-19, 80-32).  This is unambiguous.  "Wells Fargo accepts your recommendation for the ratable liquidation plan[.]"  (Docket Entry No. 80-32).  The parties' shared understanding is obvious from the fact that Wells Fargo performed in part by selling 733,500 shares on January 6 and 7, 2020, in accordance with the email agreement.  "Part performance under an agreement may remove uncertainty and establish that a contract enforceable as a bargain has been formed[.]"  *Fischer v. CTMI, L.L.C.*, 479 S.W.3d 231, 240 (Tex. 2016).  The fact that the parties used the word "recommendation" does not change that the recommendation was "accepted" and that the parties' performance show their shared belief that they had agreed that Wells Fargo would sell the specified number of shares on specified dates.

The fact that Schmitz did not have signing authority under the Trust does not change the fact or effect of the email agreement.  "Actual authority is authority that the principal intentionally conferred on the agent or allowed the agent to believe was conferred."  *Matter of Russell*, 941 F.3d 199, 204 (5th Cir. 2019) (quoting *Ebner v. First State Bank of Smithville*, 27 S.W.3d 287, 300 (Tex. App.—Austin 2000, pet. denied)).  Schmitz testified that he reviewed the liquidation plan with Jamie Casas, Occidental's Vice President and Treasurer, who was an authorized Trust signatory, and that Casas approved the plan.  (Docket Entry No. 95-13 at 11, 13).  Etheridge and Tanner sent messages to each other on December 19, 2019, acknowledging that Schmitz was not

an authorized signer but concluding that they could proceed.  Etheridge explained that waiting for a different signature would slow things down and that they needed to keep things moving.  (Docket Entry No. 96-10).

Occidental emphasizes that that it is not challenging Schmitz's authority to act on its behalf, and Wells Fargo has not pointed to authority that a contract can be avoided because one party argues that the other party's agent did not have authority, even though that party accepted the agent's authority to perform the acts at issue.  Wells Fargo ignored any concerns that it had with Schmitz's authority and moved forward on its agreement to follow Schmitz's recommendation by selling the shares.  Wells Fargo cannot now be excused from its failures to perform as agreed by arguing that it does not believe that Schmitz's authority was binding.  The undisputed evidence is that Occidental intended Schmitz's recommendation to be binding, and that Wells Fargo intended to accept and implement Schmitz's recommendation.

Wells Fargo again argues that even if the emails did create a contract, there are factual disputes material to determining whether timing was of the essence under this contract and whether Wells Fargo's attempt to perform under the contract was reasonable.  There is no evidence supporting an inference that the dates were not a part of the contract after the parties agreed to the dates by email on December 19, 2019.  Whether the dates were material is a different question from whether they were a part of the agreement.  *Cf. Breof BNK Texas, L.P. v. D.H. Hill Advisors, Inc.*, 370 S.W.3d 58, 63 (Tex. App.—Houston [14th Dist.] 2012, no pet.) (analyzing whether timing was a material term as a fact question).  Occidental does not need to show that the dates were material to show that Wells Fargo breached.  *See Bartush-Schnitzius Foods Co.*, 518 S.W.3d at 436.  And the undisputed evidence is that the dates were material.  Occidental wanted the shares sold as soon as the 2019 holiday season ended.  Occidental proposed and Wells Fargo agreed to

31

sell the shares in tranches from January 6, 2020, through January 10, 2020.  Wells Fargo understood that agreement and attempted to sell the shares on those dates.  Wells Fargo has not shown that there is a factual basis to dispute that those sale dates were a material part of the agreement.

Wells Fargo also argues that the evidence shows that it diligently tried to sell the shares, and that Occidental and Equiniti were responsible for the delays in the sales.  But this does not provide a factual basis to dispute that Wells Fargo committed to selling the shares on January 6 through January 10, 2020, and should have taken steps before then to ensure that the transactions would go through—such as finding out where the shares were held and making sure that its employees knew how to execute the trades.  Wells Fargo did not do so.  The undisputed evidence is that the team Wells Fargo tasked with making the trades and managing this multi-million dollar Trust did not have the knowledge, training, or experience to do so.  Wells Fargo's arguments as to Equiniti's alleged negligence following the January 7, 2020, botched sales attempt do not address the undisputed evidence as to Wells Fargo's failure to sell the shares as agreed, before its communications with Equiniti began.[1]

Wells Fargo argues that there was no consideration under the liquidation agreement because the fees Wells Fargo was receiving as Trustee were only for it to continue doing what it was already required to do under the Trust Agreement.  Consideration is a "bargained-for" exchange of promises.  *Roark v. Stallworth Oil & Gas, Inc.,* 813 S.W.2d 492, 496 (Tex. 1991). It

---

[1] Wells Fargo argues that there are factual disputes as to Equiniti's negligence in responding to its requests, executing a duplicate transaction request, and providing misleading explanations to Wells Fargo's representatives for the transaction problems in February 2020.  These issues are irrelevant to whether Wells Fargo breached its obligations to Occidental.  And Wells Fargo has not alleged that Equiniti owed it a duty under Texas law.   "It is fundamental that the existence of a legally cognizable duty is a prerequisite to all tort liability."  *Perry v. S.N.*, 973 S.W.2d 301, 304 (Tex. 1998).  For this reason, Occidental is entitled to summary judgment on the negligence counterclaim.

can be either a benefit to the promisor or a detriment to the promisee. *Fort Worth Indep. Sch. Dist. v. City of Fort Worth,* 22 S.W.3d 831, 841 (Tex. 2000). It can consist of a right, interest, profit, or benefit that accrues to one party, or some forbearance, loss, or responsibility undertaken or incurred by the other party. *Copeland v. Alsobrook,* 3 S.W.3d 598, 606 (Tex. App.—San Antonio 1999, pet. denied). Even an exchange of promises is sufficient consideration in Texas. *Saenz v. Martinez*, No. 04-07-00339-CV, 2008 WL 4809217, at *4 (Tex. App.—San Antonio 2008, no pet.).

In the first quarter of 2020, Occidental paid Wells Fargo more than $140,000 for its investment services as Trustee, plus additional fees and expenses. (Docket Entry No. 82-2). The Trust Agreement did not provide extra payments for specific tasks that Wells Fargo undertook in order to carry out or as part of its duties as Trustee. The Trust Agreement fees are themselves consideration. And, as Occidental argues, Wells Fargo "sought, wanted, and *obtained* Plaintiffs' consent to the time, place, and manner of the liquidation, thus eliminating the risk Wells Fargo faced that [Occidental] might later claim Wells Fargo has chosen an imprudent means or method to conduct the liquidation," which would have been contrary to its duties as Trustee, for which it was paid an annual amount.

Occidental cites *Saenz*, in which the defendant trustee had discretion under a trust agreement to make distributions, and exercised that discretion to agree to pay the plaintiff a specific amount within a specific time. 2008 WL 4809217, at *4. The court explained that the consideration was the benefit from converting "what had been a discretionary distribution by the trustee into a mandatory distribution of income." *Id.* Wells Fargo received the benefit of its agreement to sell the stock in specified tranches in order to prudently manage the Trust assets. It was attempting to fulfill its duties under the Trust Agreement. Occidental also gave up its

opportunity to pursue a different plan with the stock, such as by redeeming the stock for equal or fair value.   Both parties minimized risk through this agreement.   There was sufficient consideration.  Occidental has shown that there was a valid contract, it performed by paying Wells Fargo for its services, and Wells Fargo breached.

To the extent that Occidental's or Equiniti's conduct after January 6, 2020, bears on Wells Fargo's affirmative defenses, Occidental has met its burden of showing the absence of factual disputes material to determining that Wells Fargo breached its contract to sell the shares as promised in the email exchange.  "If the burden of proof at trial lies with the nonmoving party, the movant may satisfy its initial burden by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Duffie v. United States*, 600 F.3d at 371.  As the party with the burden on its affirmative defenses at trial, Wells Fargo "must identify specific evidence in the record and articulate the manner in which that evidence supports that party's claim."  *Id.*  Wells Fargo has not recited the elements of its affirmative defenses, nor pointed to evidence supporting its affirmative defenses.  "[T]he nonmoving party cannot survive a summary judgment motion by resting on the mere allegations of its pleadings." *Id.*  Among other things, the record shows that Wells Fargo did not know to transfer the shares to its own Depository Trust Company position and sell them from there; that Wells Fargo then compounded its own errors of not knowing how to execute the trades by entering duplicate sell orders and by not checking whether they had been executed before trying to enter a third sell order; that Wells Fargo for some reason sought help from Equiniti by calling the general customer help line instead of the Equiniti personnel specifically assigned to the Wells Fargo account; and that Wells Fargo left ignored and unopened a letter notifying Wells Fargo of problems in its efforts to execute trades.  These are among the undisputed facts in the record.  Wells Fargo's affirmative

defenses do not provide a basis to deny summary judgment in favor of Occidental on the breach of contract claims. Wells Fargo's efforts to avoid summary judgment in favor of Occidental or to support its own motion for summary judgment by blaming Occidental for steps taken by Equiniti as Occidental's agent fail for lack of any evidentiary or legal support. Wells Fargo has not pointed to factual disputes that would permit the court to deny Occidental's motion for summary judgment or shown that it is entitled to judgment as a matter of law based on the undisputed facts. Wells Fargo's motion for summary judgment is denied.

### C.    Damages

The remaining element of Occidental's breach of contract claims is damages, whether direct or consequential. *Dallas/Fort Worth Int'l Airport Bd. v. Vizant Techs., LLC*, 576 S.W.3d 362, 373 (Tex. 2019). Direct damages often include restoration of "the benefit of a plaintiff's bargain." *Signature Indus. Servs., LLC v. Int'l Paper Co.*, 638 S.W.3d 179, 186 (Tex. 2022) (citing *Quigley v. Bennett*, 227 S.W.3d 51, 56 (Tex. 2007). Consequential damages compensate the plaintiff for foreseeable losses that were caused by the breach but were not a necessary consequence of that breach. *Id.* (citing *Stuart v. Bayless*, 964 S.W.2d 920, 921 (Tex. 1998)).

"The normal measure of damages in a breach-of-contract case is the benefit-of-the-bargain measure, the purpose of which is to restore the injured party to the economic position it would have been in had the contract been performed." *Mays v. Pierce*, 203 S.W.3d 564, 577 (Tex. App.—Houston [14th Dist.] 2006, pet. denied). "The correct standard for assessing loss of benefit of the bargain damages measures the difference between the value as represented and the value as received by the nonbreaching party." *Sacks*, 481 S.W.3d at 247; *see DaimlerChrysler Motors Co., LLC v. Manuel*, 362 S.W.3d 160, 180 (Tex. App.—Fort Worth 2012, no pet.) ("One measure of

direct damages is the 'benefit of the bargain' measure, which utilizes an expectancy theory and evaluates the difference between the value as represented and the value received.").

Wells Fargo argues that Occidental cannot show that it suffered damages because the Trust Agreement provides only for discretionary payments and Wells Fargo had sole discretion over those payments. Wells Fargo additionally argues that the decline in share price between January 6 to 10 and March 2020 was unforeseeable and that the price could just as easily have increased because of the delay in the sales. Wells Fargo also argues that damages must be calculated as the difference between the contract price and the fair market value of the shares at the time of breach. Wells Fargo argues that are no direct damages because the shares had the same price on the date of the alleged agreement and the day that agreement was allegedly breached in January 2020. Any damages suffered after the breach are a consequential, not direct damage.

Occidental argues that it is entitled to damages measured by the difference between the value of the shares in January 2020 and in March 2020, when the shares were finally sold. Wells Fargo made a discretionary payment to Occidental in April 2021 because the Trust was substantially overfunded. Occidental argues that this payment would have been $39.4 million higher if Wells Fargo had not breached its obligations to sell the shares in January 2020. Occidental also argues that the difference in stock price between December 2019 and January 2020 does not address its injury because under the agreement to sell, it would have had cash, not shares, on January 10, 2020. Occidental agrees that Wells Fargo can subtract the cash that the Trust eventually received from the stock sales in March 2020.

The proper method for measuring damages is a question of law. *Yazdani-Beioky v. Sharifan*, 550 S.W.3d 808, 834 (Tex. App.—Houston [14th Dist.] 2018, pet. denied). In *Miga v. Jensen*, 96 S.W.3d 207 (Tex. 2002), the defendant offered the plaintiff a stock option but refused

to honor the agreement when the plaintiff tried to exercise it. *Id.* at 209.  The court explained that the option was a contract to sell the stock at a certain time and price. *Id.* at 215.  "[D]amages for failure to deliver stock, like failure to deliver other marketable goods, are measured precisely as they were 150 years ago: the difference between the value of the goods bargained for and the contract price at the time set for delivery." *Id.* at 216.  The plaintiff in *Miga* "simply did not claim lost profits," and the court explained that its holding would not preclude the award of lost profits in contract disputes involving stock and stock options. *Id.* at 215.

Wells Fargo argues that the *Miga* calculation applies here, and because there is no difference between the price at the time of the parties' December 2019 agreement and the price at the time of the botched stock sales attempts in January 2020, Occidental is not entitled to any damages.  Occidental distinguishes *Miga* because the injury here is from the failed sales of stock, not the delivery of shares.  The court agrees.  "Applying the *Miga* measure of damages makes sense where an option holder's exercise of his right to buy stock was rejected and no delivery of stock occurred." *Yazdani-Beioky*, 550 S.W.3d at 834.  The *Miga* calculation is inapplicable here because Occidental is seeking the difference between the price at the time the stock should have been sold had Wells Fargo properly executed the sales and the price at the time the stock was sold.  Occidental seeks lost profits.

Occidental agrees that the Trustee had no obligation to make interim payments.  But Occidental's damages measure is not only from receiving a smaller cash distribution in April 2021.  The damages measure reflects the loss in value in the assets held in the Trust, assets that were worth $39.4 million less than they would have been had the stock been sold according to the parties' agreement.

Occidental has sufficiently shown that it suffered damages to prove Wells Fargo's liability for its breach of contract claim. Occidental did not move for summary judgment as to the calculation of its damages. It reaffirmed this position at the hearing on these motions:

> The court:     If I can interrupt, Ms. Patrick, are you asking the Court to deny Wells Fargo's motion for summary judgment that there are no damages that are recoverable and leave the issue of what damages might be recoverable and in what amount for another day?
>
> Ms. Patrick:    Correct.

As a matter of law, based on the record evidence, Occidental is entitled to summary judgment that Wells Fargo is liable for breaching its contractual duties under the Trust Agreement and the December 2019 email agreement.

## VI.    Conclusion and Order

Occidental's motion for summary judgment, (Docket Entry No. 80), is granted as to liability for the breach of contract claim, and granted as to the dismissal of the Wells Fargo counterclaim. Wells Fargo's motion for summary judgment is denied. (Docket Entry No. 81). The motion for leave to amend and the motions to seal are granted. (Docket Entry Nos. 74, 83, 92).

No later than September 9, 2022, the parties must provide a proposed amended scheduling order, agreed upon if possible, to resolve the remaining issues.

SIGNED on August 18, 2022, at Houston, Texas.

_____
Lee H. Rosenthal
Chief United States District Judge