United States District Court
Southern District of Texas

**ENTERED**

May 31, 2023

Nathan Ochsner, Clerk

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| OCCIDENTAL PETROLEUM CORP., | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. H-21-1126 |
| | § | |
| WELLS FARGO BANK, N.A., | § | |
| | § | |
| Defendant. | § | |

**MEMORANDUM AND ORDER**

The Occidental Petroleum Corporation and its predecessor Anadarko Petroleum (together, "Occidental") sued the Trustee of their rabbi trust, Wells Fargo Bank, for failing to sell hundreds of thousands of shares of stock in the trust on specified dates in January 2020. When Wells Fargo finally sold the shares, months later, the price had steeply declined. Occidental sued Wells Fargo for breach of contract. Wells Fargo counterclaimed based on the alleged negligence of Occidental's transfer agent, Equiniti Trust Company, in selling the shares.

In August 2022, this court granted Occidental's motion for summary judgment, (Docket Entry No. 80), and denied Wells Fargo's motion for summary judgment, (Docket Entry No. 81). (Docket Entry No. 116). The court found that "the evidence indisputably show[ed] that Wells Fargo . . . accept[ed] Occidental's recommendation as to when to sell the shares, but failed to execute the sales as agreed. Wells Fargo did not reconsider its decision not to sell the shares; through a series of clumsy missteps, it simply failed to do so." (Docket Entry No. 116 at 28–29). As to Wells Fargo's counterclaim, the court found that "Wells Fargo ha[d] not recited the elements of its affirmative defenses, nor pointed to evidence supporting its affirmative defenses," and accordingly denied summary judgment in Wells Fargo's favor. (Docket Entry No. 116 at 34).

The remaining issue is the measure of damages. Occidental has moved for summary judgment, seeking about $38 million in damages as the amount it would have received had Wells Fargo followed the parties' agreement to sell a specified number of shares on specified days, subtracting the amount it did receive when Wells Fargo finally sold the shares. (Docket Entry No. 122). Wells Fargo calculated Occidental's damages as $9.764 million on the low end and $18.529 million on the high end. (Docket Entry No. 127). Its low-end measure uses a different price per share than Occidental and takes into consideration the effect of reinvestment. (Docket Entry No. 127). The high-end measure uses the same price per share as Occidental and also takes into consideration the effect of reinvestment. (Docket Entry No. 127). Wells Fargo argues that the difference between the proposed measures used to calculate damages presents a factual dispute that precludes summary judgment. (Docket Entry No. 127 at 11–12). Occidental argues that the measure of damages is a legal question.

The court heard oral argument on the summary judgment motion, (Docket Entry No. 137), and requested and received a series of supplemental briefs, (Docket Entry Nos. 142, 143, 146, 147). Based on the pleadings; the motions, responses, and replies; the applicable law; the summary judgment record; and the arguments of able counsel for both parties, Occidental's motion for summary judgment, (Docket Entry No. 122), is granted. The method for calculating damages is a question of law, and the amount that results from applying the appropriate method is a matter of arithmetic.

The court holds that the appropriate method for calculating the damages is the difference between the price of the stock on the dates Occidental and Wells Fargo agreed Wells Fargo would sell and the price on the dates Wells Fargo did sell. Reinvestment should not be taken into account.

Using this method, Occidental is entitled as a matter of law to damages in the amount of $38,008,313. The reasons are explained below.

## I.      Factual Background

The factual background is set out detail in the court's earlier summary judgment memorandum and order. (Docket Entry No. 116 at 2–12). As a brief overview, in May 1995, Anadarko, Occidental's predecessor, established a rabbi trust through a Benefits Trust Agreement with Wachovia Bank of North Carolina as the Trustee. (Docket Entry No. 80-4 at 1). Wells Fargo became the Trustee after acquiring Wachovia in December 2008. (Docket Entry No. 80-4 at 2). The Trust Agreement allowed Anadarko to direct the Trustee to acquire, retain, or dispose of investments before a change in control, but Anadarko's right to direct the Trustee ended after a change in control. (Docket Entry No. 80-3 at 12, 24). Occidental acquired Anadarko in August 2019, which was a change in control under the Trust Agreement. (Docket Entry No. 80-4 at 3). After the conversion of Anadarko shares to Occidental shares, the Trust held roughly $500 million in assets. (Docket Entry No. 80-4 at 10, 11); (Docket Entry No. 82-5 at 3).

Wells Fargo considered the Trust account a "Top-50" relationship and assigned a team of professionals to the account. (Docket Entry No. 80-7). In October 2019, the investment manager responsible for the Trust's asset management and investment strategy concluded that about $240 million of the almost $500 million held in the Trust needed to be kept in cash to pay out employee benefits and honor separation agreements in the near term. (Docket Entry No. 80-7 at 10–11). The Plan owed $185 million in future obligations, and Wells Fargo intended the Trust to keep the remaining $73 million in cash. (Docket Entry No. 80-13).

On October 24, 2019, the Wells Fargo investment manager presented an investment strategy to Occidental. The proposed strategy was to sell Occidental stock in compliance with

Wells Fargo's investment guidelines.   (Docket Entry No. 80-7 at 12).   In December 2019, Occidental expressed concerns about the discount and disruption to its liquidity that could result from the sale of so many shares at once.   After back-and-forth discussions, a classic meeting of the minds occurred: Wells Fargo agreed to follow Occidental's recommendation to execute the sale of 381,420 shares each day from January 6, 2020, to January 10, 2020.   (Docket Entry No. 80-7 at 17); (Docket Entry No. 80-5 at 20).

So much for a meeting of the minds.   On January 7, 2020, Wells Fargo sold only 352,080 shares, the number it held directly in its Depository Trust Company account, instead of the 381,420 shares it had agreed to sell on that date.   (Docket Entry No. 80-4 at 3).   The remaining Trust shares were held by Wells Fargo's transfer agent, Equiniti, in "book-entry" form through the Direct Registration System.   Wells Fargo did not transfer these shares into its Depository Trust Company account before the January 2020 trades.   (Docket Entry No. 80-22 at 4).   The investment manager responsible for executing the Occidental stock sales for Wells Fargo, Nikki Tanner, apparently did not know that Equiniti had control of the shares.   No other Wells Fargo representative told her. (Docket Entry No. 80-7 at 21).   Ms. Tanner testified that despite her position at Wells Fargo and her assignment to the Occidental account, she did not know the significance of whether stock is held in the Depository Trust Company by a broker or in the Direct Registration position by a transfer agent.   Her Wells Fargo supervisor was similarly uninformed.   (Docket Entry No. 80-7); (Docket Entry No. 80-23 at 5–6).

On January 7, 2020, Tonya Inscore, another Wells Fargo supervisor, directed Tanner to instruct the transfer agent to sell the shares.   (Docket Entry No. 80-23 at 5–6).   Tanner then submitted a request to Equiniti to sell the remaining 29,340 shares that Wells Fargo had agreed to sell on January 7, 2020.   Equiniti did so on January 9, 2020.   But for some reason, Wells Fargo

was not aware of the sale and made a second request to Equiniti to sell the same shares. Equiniti sold an additional 29,340 shares on January 10, 2020.

Tanner also submitted three requests to Equiniti to sell 381,420 shares on January 8, January 9, and January 10. But because Equiniti had sold 29,340 shares on January 9 and another 29,340 shares on January 10, it rejected the transaction request because the numbers did not match up. (Docket Entry No. 80-7 at 33). Equiniti mailed a letter to Wells Fargo's address of record on January 16, 2020, asking for clarification. No one from Wells Fargo followed up with Equiniti until February 14, 2020. After further discussions with Equiniti and Occidental, Wells Fargo requested that the remaining shares be transferred to the Depository Trust Account on March 17, 2020. They were transferred on March 18, 2020. Wells Fargo sold the remaining 1,114,920 shares at $9.98 per share in a block sale on March 20, 2020. (Docket Entry No. 80-4 at 4).

Occidental sued Wells Fargo for breach of contract in April 2021. The parties filed cross motions for summary judgment on liability. (Docket Entry Nos. 80, 81). The court entered summary judgment in favor of Occidental, finding Wells Fargo liable for breaching its agreement to sell certain amounts of shares on certain dates. (Docket Entry No. 116).

In granting summary judgment on liability, the court found that the Trust Agreement between Wells Fargo and Occidental was a valid contract, under which Wells Fargo agreed to sell the funds held in the Trust, and that Wells Fargo breached the December 2019 agreement by failing to timely sell the Occidental shares on the promised dates in January 2020. The court found that the undisputed evidence showed that Wells Fargo decided to diversify Occidental's portfolio and hold only enough cash to meet the Trust obligations under the relevant benefit Plans, consistent with the scope of Wells Fargo's responsibilities under § 5.5(a) and § 5.5(n) of the Trust Agreement, as well as with other duties imposed by law under § 5.5. Wells Fargo agreed to help

Occidental diversify its holdings by selling the Occidental stock and agreed to sell specified amounts on the specified dates.  Wells Fargo agreed to follow this timing arrangement to reduce the risk of selling all the stock at once and to reduce the risk of extending the sale dates too far into the uncertain future.  Knowing these risks and the agreed plan to reduce these risks, Wells Fargo simply failed to execute the sales when and as specified in the agreed plan.  The risks materialized.

The court also found that the parties entered a separate agreement when Wells Fargo accepted Occidental's recommended liquidation plan by email on December 19, 2019.  More specifically, the court found that Wells Fargo entered into an agreement that "[b]eginning January 6, 2020," Wells Fargo would sell "381,420 shares each day over the course of the week with a final liquidation on January 10, 2020."  (Docket Entry Nos. 80-19, 80-32).  The undisputed evidence showed that Wells Fargo intended to accept and implement this agreement.  The undisputed evidence also showed that Wells Fargo knew that the dates were material to Occidental, which wanted the shares sold as soon as the 2019 holiday season ended.  Wells Fargo agreed to sell the shares in equal tranches from January 6th to January 10th in 2020.  It did not do so.

Finally, the court rejected Wells Fargo's affirmative defense, which attempted to shift the blame to Occidental and Equiniti.  The court found that Wells Fargo failed to meet its burden to identify "specific evidence in the record and articulate the manner in which that evidence supports [Wells Fargo's] claim."  *Duffie v. United States*, 600 F.3d 362, 371 (5th Cir. 2010).  Instead, the record provided ample undisputed evidence supporting the conclusion that Wells Fargo breached its agreement with Occidental; that Wells Fargo did not know to transfer the shares to its own Depository Trust Account before January 2020 so that it did not need to order Equiniti to sell the shares; that Wells Fargo then compounded its own error of not knowing how to execute the trades by entering duplicate sell orders and by not checking whether those orders had been executed

before trying to enter yet another order; that Wells Fargo for some reason sought help from Equiniti by calling the general customer help line instead of the Equiniti personnel specifically assigned to the Wells Fargo account; and that Wells Fargo left ignored and unopened a letter notifying Wells Fargo of the problems in its efforts to execute the trades.  Wells Fargo's affirmative defense provided no basis to grant summary judgment in Wells Fargo's favor.

The court's prior order decided only liability.  Occidental has now filed a summary judgment motion on damages, which Wells Fargo opposes.  (Docket Entry Nos. 122, 127).

## IV.   The Summary Judgment Standard and Evidence

### A.   The Summary Judgment Standard

"Summary judgment is appropriate where 'the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Springboards to Educ., Inc. v. Pharr-San Juan-Alamo Indep. Sch. Dist.*, 33 F.4th 747, 749 (5th Cir. 2022) (quoting FED. R. CIV. P. 56(a)).  "A fact is material if it might affect the outcome of the suit and a factual dispute is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Thompson v. Microsoft Corp.*, 2 F.4th 460, 467 (5th Cir. 2021) (quoting reference omitted).  The moving party "always bears the initial responsibility of informing the district court of the basis for its motion[] and identifying" the record evidence "which it believes demonstrate[s] the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

"When 'the [nonmovant] bears the burden of proof at trial,' a party moving for summary judgment 'may merely point to the absence of evidence and thereby shift to the [nonmovant] the burden of demonstrating by competent summary judgment proof that there is [a dispute] of material fact warranting trial.'" *MDK S.R.L. v. Proplant Inc.*, 25 F.4th 360, 368 (5th Cir. 2022)

(quoting reference omitted). "However[,] the movant 'need not negate the elements of the nonmovant's case.'" *Terral River Serv., Inc. v. SCF Marine Inc.*, 20 F.4th 1015, 1018 (5th Cir. 2021) (quoting *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc) (per curiam)). "If 'reasonable minds could differ' on 'the import of the evidence,' a court must deny the motion." *Sanchez v. Young County*, 956 F.3d 785, 791 (5th Cir. 2020) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250–51 (1986)).

After the movant meets the Rule 56(c) burden, "the [nonmovant] must come forward with 'specific facts' showing a genuine factual issue for trial." *Houston v. Tex. Dep't of Agric.*, 17 F.4th 576, 581 (5th Cir. 2021) (quoting references omitted). The nonmovant "must identify specific evidence in the record and articulate the 'precise manner' in which the evidence" aids their case. *Shah v. VHS San Antonio Partners, L.L.C.*, 985 F.3d 450, 453 (5th Cir. 2021) (quoting reference omitted). All reasonable inferences are drawn in the nonmovant's favor, *Loftin v. City of Prentiss*, 33 F.4th 774, 779 (5th Cir. 2022), but a nonmovant "cannot defeat summary judgment with 'conclusory allegations, unsubstantiated assertions, or only a scintilla of evidence.'" *Jones v. Gulf Coast Rest. Grp., Inc.*, 8 F.4th 363, 369 (5th Cir. 2021) (quoting reference omitted).

B.   **The Summary Judgment Evidence**

Occidental submitted the following evidence in support of the motion for summary judgment:

- The court's memorandum and order dated August 18, 2022, (Docket Entry No. 122-1);

- The expert report of Joseph J. Thomas dated July 18, 2022, (Docket Entry No. 122-2);

- The expert report of Vinita Juneja dated July 18, 2022, and her accompanying affidavit dated September 23, 2023, (Docket Entry No. 122-3);

- The joint statement of stipulated facts, (Docket Entry No. 122-4);

- The quarterly account statement for account 020065900 for the quarter ending on March 31, 2020, (Docket Entry No. 122-5);

- A check from Equinity Trust Co. dated January 9, 2020, (Docket Entry No. 122-6);

- A check from Equinity Trust Co. dated January 10, 2020, (Docket Entry No. 122-7);

- The monthly account statement for account 020065900 for the month ending on April 30, 2020, (Docket Entry No. 122-8);

- Excerpts of the deposition of Wells Fargo's Rule 30(b)(6) representative, Monique Etheridge, dated May 6, 2022, (Docket Entry Nos. 122-9, 142-1); and

- An email dated July 29, 2020, attaching letter from Melissa Hunt at Occidental to Monique Etheridge and Diana S. Dietsch at Wells Fargo, (Docket Entry No. 122-10).

Wells Fargo submitted evidence in response to Occidental's motion for summary judgment, as follows:

- The declaration of Megan McKennon, an attorney for Wells Fargo, which included as exhibits: (A) the October 14, 2022, premotion conference letter, (B) excerpts of the August 4, 2022, hearing, (C) excerpts of the deposition of Jason Schmitz at Occidental, (D) excerpts of the deposition of Nikki Tanner at Wells Fargo and (E) excerpts of the deposition of Jane Mason at Wells Fargo.  (Docket Entry No. 127-2);

- The declaration of Rebecca Lindahl, an attorney for Wells Fargo, which included as exhibits: (A) discovery requests, (B) an email correspondence over several days in September 2022, and (C) excerpts of the Jason Schmitz deposition, (Docket Entry No. 127-3);

- The declaration of Nikki Tanner at Wells Fargo, (Docket Entry No. 127-4);

- The declaration and expert report of David Blackwell, (Docket Entry No. 127-5); and

- The declaration, expert report, and rebuttal expert report of Joseph Thomas, (Docket Entry No. 127-6).

## V.     Analysis

The remaining element of Occidental's breach of contract claim is damages.  Undisputed record evidence establishes that Wells Fargo agreed to sell five batches of 381,420 shares on each day beginning January 6 and continuing through January 10, 2020.  Wells Fargo sold 381,420 shares on January 6, but then sold only 352,080 shares on January 7; no shares on January 8; 29,340 shares on January 9; and 29,340 shares on January 10.  The remaining 1,114,920 shares were sold on March 20, 2020.

The dates, number of shares actually sold, the price per share, and the sale proceeds (rounded to the nearest dollar) on the dates Wells Fargo agreed to sell the stock but did not are set out in the first five entries in the chart below.  The last line in the chart shows those same values for the date in March 2020 when Wells Fargo finally sold the remaining shares.

| Date | Number of Shares Actually Sold | Sale Price Per Share | Sale Proceeds |
|---|---|---|---|
| January 6, 2020 | 381,420 | $44.95 | $17,137,914 |
| January 7, 2020 | 352,080 | $44.75 | $15,748,740 |
| January 8, 2020 | 0 | n/a | $0.00 |
| January 9, 2020 | 29,340 | $44.78 | $1,310,257 |
| January 10, 2020 | 29,340 | $46.03 | $1,346,955 |
| March 20, 2020 | 1,114,920 | $9.98 | $11,104,469 |

(Docket Entry No. 122 at 3); (Docket Entry No. 122-4 at 4–5).

The price per share on the dates Wells Fargo had agreed to sell ranged from $44.75 to $46.03.  The price per share on the date Wells Fargo actually sold the remaining shares was $9.98.  (Docket Entry No. 122 at 3); (Docket Entry No. 122-4 at 4–5).  The question is what "economic position . . . would [Occidental] have been in had the contract been performed" as agreed?  *Mays v. Pierce*, 203 S.W.3d 564, 577 (Tex. App.—Houston [14th Dist.] 2006, pet. denied).

Occidental's expert, Dr. Vinita Juneja, answered that question by estimating what the price per share on January 7 to January 10 would have been had the agreed upon sales been performed.  Dr. Juneja then calculated the sale proceeds assuming that Wells Fargo had sold 381,420 shares on the dates the parties agreed to.  Using that method, the dates the specific numbers of shares were supposed to have been sold, the number of shares that should have been sold on those dates, the estimated sale price per share, and the estimated sale proceeds if those sales had taken place as the parties had agreed, are summarized in the chart below.

| Date | Number of Shares That Should Have Been Sold As Agreed | Estimated Sale Price Per Share Had the Shares Been Sold As Agreed | Estimated Sale Proceeds Had the Shares Been Sold As Agreed |
|---|---|---|---|
| January 6, 2020 | 381,420 | $44.95 | $17,137,914 |
| January 7, 2020 | 381,420 | $44.74 | $17,060,719 |
| January 8, 2020 | 381,420 | $44.75 | $17,059,746 |
| January 9, 2020 | 381,420 | $44.36 | $16,912,895 |
| January 10, 2020 | 381,420 | $45.21 | $17,236,759 |

11

(Docket Entry No. 122 at 4); (Docket Entry No. 122-3).

Using this method, the sale proceeds should have totaled $85,408,032.  (Docket Entry No. 122 at 4); (Docket Entry No. 122-3).  Subtracting $46,648,334 (the amount Occidental actually received when Wells Fargo sold the shares) from $85,408,032 (the amount Occidental would have received if Wells Fargo had sold the shares when agreed) equals $38,759,698.  Occidental seeks $38,008,313 in damages, which is the difference in the sale proceeds had Wells Fargo sold when and as agreed from the sale proceeds when Wells Fargo did sell, minus the fees, expenses, and interest that each sale involved.

Wells Fargo does not argue that Dr. Juneja was wrong in her estimated volume-weighted average price for each of the days in question or in her arithmetic.  (Docket Entry No. 127 at 10–11).  Instead, Wells Fargo offers two different methods to calculate damages.  (Docket Entry No. 127 at 11).  In the first model, Wells Fargo's expert, Mr. Joseph Thomas, valued the share price at $38.70 per share because that was the early January 2020 share price the parties expected in December 2019, when they agreed to sell in early January 2020.  (Docket Entry No. 127 at 11).  Mr. Thomas estimated the value of the proceeds had Wells Fargo reinvested them between January 6 and March 20, 2020, which was also part of the agreement.  (Docket Entry No. 127 at 11).  Applying this method, Mr. Thomas calculated Occidental's damages at $9.764 million.  (Docket Entry No. 127 at 11).

The second method Wells Fargo proposes begins with Dr. Juneja's estimates for price per share, and then anticipates the loss in proceeds that would have occurred had Wells Fargo reinvested the proceeds between January 6, 2020, and March 20, 2020.  (Docket Entry No. 127 at 11).  Applying this method, Mr. Thomas calculated Occidental's damages at $18.529 million.  (Docket Entry No. 127 at 11).

Wells Fargo argues that the disputes over the appropriate method for calculating damages are fact issues that should be tried before a jury and preclude summary judgment.  (Docket Entry No. 127 at 6).  Occidental argues that the method used to calculate damages is a legal issue, and that the rest is arithmetic.

The court has three issues to decide.  First, does a material factual dispute exist and preclude summary judgment?  Second, if summary judgment is appropriate, what is the correct method for valuing the price per share?  Is it the volume-weighted average price (which is essentially an estimate of the actual price on each of the days in question), or is it the early January 2020 price the parties expected in December 2019 (that is, what the parties expected in December the price per share would be in January)?  Third, regardless of the price per share calculation, should the reinvestment value be taken into account?

There is no factual dispute that precludes summary judgment.  Wells Fargo does not argue that either Dr. Juneja's arithmetic or her estimates of the price per share using the volume-weighted average price method were inaccurate.  To the contrary, the second model Wells Fargo offers relies on Dr. Juneja's estimates.  Wells Fargo does not dispute the facts but rather the method for measuring damages that Dr. Juneja used to calculate Occidental's damages.  The proper method for measuring damages is a question of law.  *Yazdani-Beioky v. Sharifan*, 550 S.W.3d 808, 834 (Tex. App.—Houston [14th Dist.] 2018, pet. denied).  This is a legal issue for the court to decide.

So, what is the proper method for calculating damages in this case?  "The normal measure of damages in a breach-of-contract case is the benefit-of-the-bargain measure, the purpose of which is to restore the injured party to the economic position it would have been in had the contract been performed."  *Mays*, 203 S.W.3d at 577.  "The correct standard for assessing loss of benefit of the bargain damages measures the difference between the value as represented and the value as

13

received by the nonbreaching party." *Sacks v. Hall*, 481 S.W.3d 238, 247 (Tex. App.—Houston [1st Dist.] 2015, no pet.); *see DaimlerChrysler Motors Co., LLC v. Manuel*, 362 S.W.3d 160, 180 (Tex. App.—Fort Worth 2012, no pet.) ("One measure of direct damages is the 'benefit of the bargain' measure, which utilizes an expectancy theory and evaluates the difference between the value as represented and the value received.").

Wells Fargo spends much of its brief in opposition to summary judgment arguing that Occidental failed to identify whether the damages it seeks are direct or consequential.  (Docket Entry No. 127 at 16–21).  This argument not only appears to misstate Occidental's brief, but also appears to misunderstand the legal standard that applies.  Direct damages are the amount that the plaintiff would have received as "the benefit of [the] plaintiff's bargain." *Signature Indus. Servs., LLC v. Int'l Paper Co.*, 638 S.W.3d 179, 186 (Tex. 2022) (citing *Quigley v. Bennett*, 227 S.W.3d 51, 56 (Tex. 2007)).  Consequential damages are the amount that would compensate the plaintiff for foreseeable losses caused by the breach but were not a necessary consequence of, and would not result in every case involving, that breach.  *Id.* (citing *Stuart v. Bayless*, 964 S.W.2d 920, 921 (Tex. 1998)).

Wells Fargo argues that the price of the stock from January 6 to January 10, 2020, was unforeseeable, noting that "everyone to address the issue—whether an expert or fact witness (on either side)—agrees that movements in the price of a stock are unpredictable and unforeseeable." (Docket Entry No. 127 at 17).  From that, Wells Fargo concludes that the damages amount was unforeseeable, reasoning that because the damages do not flow from the breach, they are not direct; therefore, the damages must be consequential; and Occidental cannot recover because consequential damages require foreseeability, and the damages here were not foreseeable.

This is circular reasoning that incorrectly applies the law.  Damages can directly and foreseeably flow from a breach, even if the exact amount cannot be foreseen.  Consider the following hypothetical.  James enters into an agreement with Betty to sell her gold bracelet.  The terms are that the sale must occur on September 1st and the bracelet must be sold for whatever the fair market price of gold is on that date.  The fair market price for this bracelet on September 1st is $10,000.  But James does not sell the bracelet on September 1st.  Instead, he forgets about it until October 1st, when he sells it for the fair market value that day, $8,000.  James breached the contract and owes Betty $2,000, the difference between what the bracelet would have sold for on September 1st had James not breached the contract and sold, and what the bracelet actually sold for on October 1st.  Those are direct damages.

James could not argue that Betty's damages do not directly flow from the breach because the price of gold fluctuates (and could have even fluctuated to Betty's advantage).  That logic would turn a basic contract-law principle on its head.  Direct damages are about putting the nonbreaching party in the position it would have been in had the breaching party performed the duties owed, as established by the evidence.  Direct damages are not about putting the nonbreaching party in the position it could have been in based on predictions or assumptions about possible future circumstances or events.

Wells Fargo's failure to sell hundreds of thousands of shares of stock on specified dates and then selling the stocks later when the price per share had declined is a textbook example of direct damages.  *See* RESTATEMENT (SECOND) OF CONTRACTS § 347 cmt. b (AM. LAW INST. 1981) (noting in its explanation of direct damages that "[i]f defective or partial performance is rendered, the loss in value caused by the breach is equal to the difference between the value that the performance would have had if there had been no breach and the value of such performance as

was actually rendered"). As Occidental aptly summarizes, "Wells Fargo challenges Plaintiffs' *entitlement* to damages—an issue already decided—rather than the *amount* of damages needed to restore the benefit of Plaintiffs as determined by the Court." (Docket Entry No. 130 at 8).

The parties seem to agree that the starting point for calculating damages is figuring out the price per share on the dates the parties agreed to sell the shares, that is, from January 6 to 10, 2020. The parties agree that the next step is multiplying those share prices for each day from January 6 to 10, 2023, by the 381,420 shares that should have been sold on each of those days. Wells Fargo argues that the share value should be $38.70, the January 2020 price that Wells Fargo argues the parties anticipated in December 2019. (Docket Entry No. 127 at 11). Wells Fargo argues that the parties' expectation of what the price per share would be is the correct standard because "the purpose of damages in a case such as this is to fulfill the parties' reasonably foreseeable expectations about the benefits each would receive and would convey at the time they entered into their bargain." (Docket Entry No. 127 at 16).

Wells Fargo relies primarily on two recent Texas Supreme Court cases to make this point: *Signature Industrial Services, LLC v. International Paper Co.*, 638 S.W.3d 179 (Tex. 2022), and *MSW Corpus Christi Landfill, Ltd. v. Gulley-Hurst, L.L.C.*, No. 21-1021, 2023 WL 2618531 (Tex. Mar. 24, 2023). (Docket Entry No. 127 at 16); (Docket Entry No. 146). Both cases largely concern consequential damages, and both are easily distinguishable.

In *Signature Industrial*, a construction company entered into an agreement to upgrade equipment for a paper company for $775,000, but the project ended up costing significantly more. 638 S.W.3d at 184. The construction company sought to recover the additional costs that it incurred (approximately $2.4 million) and sued the paper company when the paper company refused. *Id.* at 184–85. The issue in that case did not concern whether the construction company

16

was entitled to the additional costs it incurred while upgrading the paper company's equipment—it was. *Id.* at 186. Instead, the issue was whether the paper company's breach foreseeably led to the construction company's inability to be acquired by another company, an acquisition that could have been worth $42 million. *Id.* at 185–86. The court held that it was not. "It stands to reason that losing business opportunities will often contribute to a decline in a company's market value, but whether this will be the case—and to what extent—depends on many factors typically beyond the reasonable contemplation of the breaching party." *Id.* at 189–90. The loss of an entirely separate contract—that the defendant was not even aware was being negotiated—was too speculative and unforeseeable to support consequential damages. *Id.*

In *MSW*, two companies entered into an agreement, requiring one party to sell an interest in property to the other for $7.5 million if certain conditions did not occur. 2023 WL 2618531, at *1. They did not, and the seller conveyed clear title to the buyer. *Id.* But the buyer did not fully pay for the interest in the property. *Id.* Meanwhile, the interest in the property had appreciated significantly in value, up to $17.735 million. *Id.* The Texas Supreme Court addressed two issues. First, did the seller owe the market value of the interest in the property at the time of the breach or did the seller owe the contract price? *Id.* at *2. Second, was the seller owed consequential damages for the money the seller could have obtained by investing the proceeds received from the sale? *Id.* at *3.

As to the first issue, the Texas Supreme Court held that the appropriate measure of damages was tied to the contract price of the property, not its market value at the time of the breach of the contract. *Id.* at *2–3. The reasoning is particularly helpful:

> The general rule for measuring benefit of the bargain damages is to calculate the difference between what was promised and what was received. Although courts have noted that "[w]hen the breached contract is for real estate, the measure of [the seller's] damages is the difference between the contract price and the property's

market value at the time of the breach," *Barry v. Jackson*, 309 S.W.3d 135, 140 (Tex. App.—Austin 2010, no pet.), this formula applies only when the value of the property has remained the same or decreased after the purchaser's breach, leaving the seller unable to receive the expected value of the contract. When the property's market value at the time of breach exceeds the contract price, the correct measure of actual, compensatory, benefit-of-the-bargain damages is the difference between the promised contract price and what the seller received.

Policy and precedent both support this conclusion. The purpose of actual, benefit-of-the-bargain damages is to place the seller "in the same economic position he would have been in had the contract been performed." *Id.* at 140. A party "generally should be awarded neither less nor more than his actual damages." *Stewart v. Basey*, 245 S.W.2d 484, 486 (Tex. 1952). Permitting a seller to recover more than the contract price would place the seller in a better economic position than had the contract been performed. Worse, this windfall would come at the buyer's expense.

Conversely, calculating benefit-of-the bargain damages as the difference between what the seller expected and what the seller received causally connects the seller's compensation to the buyer's breach. The breach cost the seller the previously agreed-upon contract price, not the property's market value. The seller lost the opportunity to sell the property at market value not because of the buyer's actions, but because the seller decided to contract with the buyer for a lower price.

*Id.* at *2–3 (citations omitted).

The second issue was whether the seller was entitled to consequential damages for the money the seller could have obtained by getting a loan (which it could not do because of the buyer's breach) and investing the loan proceeds. The court held that the seller was not entitled to these damages. *Id.* at *3. "A plaintiff may recover consequential damages only if 'the parties contemplated at the time they made the contract that such damages would be a probable result of the breach.'" *Id.* (quoting reference omitted). Because the seller's inability to invest was too attenuated from the relevant breach, the court held that it was not a foreseeably or probable result of the buyer's breach. *Id.*

Applying *Signature Industrial* and *MSW* to this case backs the conclusion that the correct calculation of damages requires use of the price per share on each day of the breach, and an

adjustment for reinvestments is unwarranted because the reinvestment effect is speculative and attenuated from the relevant breach.

*Signature Industrial* and *MSW* held that a plaintiff is entitled to damages in the amount expected under the contract. Here, both Wells Fargo and Occidental expected that the shares would be sold at the market value of the shares was on each day from January 6 to January 10, 2020. The correct measure of damages, accordingly, requires using the price per share on each day from January 6 to January 10, 2020. That's what the parties agreed to. That's what the parties expected. That's what would have happened had the parties' agreement been performed.

Wells Fargo attempts to reframe *Signature Industrial* and *MSW* as supportive of its arguments by taking the word "expect" out of context. Wells Fargo does so by relying on statements such as the following: "calculating benefit of the bargain damages as the difference between what the seller *expected* and what she *received* causally connects the seller's compensation to the buyer's breach. The breach in that case cost the seller the previously agreed-upon contract price, not the property's market value." *MSW*, 2023 WL 2618531 at *2–3 (emphasis added); (Docket Entry No. 146 at 2). Wells Fargo takes this to mean that the price per share should be $38.70 because that is what the parties expected the price per share to be in December 2019, when they entered the agreement. (Docket Entry No. 127 at 11).

But an expectation cannot be stripped from the context of the parties' agreement. The parties did not agree to sell each share for $38.70. The parties agreed that Wells Fargo would sell specified amounts of shares for the market value on each day from January 6 to January 10, 2020. (Think back to the James and Betty hypothetical.). That's what the parties expected. Occidental expected to receive the proceeds from selling the specified amounts of shares at whatever the price was on the dates the shares were sold, when and as specified. The actual price per share on the

specified dates when Wells Fargo breached the agreement by failing to sell the specified number of shares on those specified dates is the basis of Occidental's expert's damages calculation: $44.74 per share on January 7, 2020; $44.75 per share on January 8, 2020; $44.36 per share on January 9, 2020; and $45.21 per share on January 10, 2020.  (Docket Entry No. 122 at 4); (Docket Entry No. 122-3).  Subtracting out additional expenses brings the total damages to $38,008,313.

The final question is whether that total should be reduced to take into account the value of possible reinvestments.  Wells Fargo argues that the agreement required Wells Fargo to reinvest the proceeds from the sale.  Wells Fargo argues that if it had reinvested the proceeds obtained from finally selling the shares in March 2020, the total amount of the proceeds and the benefit Occidental received would have gone down.

But the record does not establish that the agreement required Wells Fargo to reinvest the proceeds during a specific time period as opposed to keeping the money in cash.  As Jason Schmitz, an Occidental representative, testified, although "the proceeds would have been reinvested across a diversified portfolio of assets," "if the trustee . . . decided that they wanted to hold cash, they could have decided to hold cash and chosen the time to reinvest." (Docket Entry No. 127-2 at 60–61).  Wells Fargo's only evidence contradicting this point is the declaration of Nikki Tanner, in which she stated that she "never intended to wait until April or May 2020" to reinvest.  (Docket Entry No. 127-4 at 4).  Although the record supports that the parties had an agreement to reinvest, it does not support a finding that the agreement required reinvestment to occur on specific dates in 2020.

Moreover, whether Wells Fargo would have actually reinvested the proceeds after the planned January 2020 sales (which Wells Fargo failed to execute) is also speculative and not supported by the record.  The record shows that Wells Fargo did not reinvest over $80 million of

trust assets.  The record shows at best an attenuated connection between the breach (Wells Fargo's failure to sell the shares in January 2020) and any reinvestments.  In other words, Wells Fargo cannot show that the results of reinvestments not made "would be a probable result of the breach.'" 2023 WL 2618531, at *3 (quoting reference omitted).

Wells Fargo admits as much, stating in its brief in opposition to summary judgment that "the value of the reinvestment portfolio, including assets purchased with the proceeds of the share sales, . . . could not have been foreseeable."  (Docket Entry No. 127 at 12).  Wells Fargo appears to be attempting to avoid liability for the damages amounts on the ground that they were unforeseeable, while also arguing that it should benefit from reinvestments not made, which are even more unforeseeable. *See also* (Docket Entry No. 130 at 13 ("Indeed, [Wells Fargo] made no attempt to account for reinvestment losses when presenting its own alleged damages sought by its counterclaim and third-party claims against Equiniti.").

## V.    Conclusion and Order

Occidental's motion for summary judgment, (Docket Entry No. 122), is granted.  Judgment is entered in the amount of $38,008,313, with prejudgment interest accruing at a rate of 5.5 percent as of January 25, 2021, and postjudgment interest accruing at a rate of 5.15 percent as of the date of this judgment, per annum.  Occidental's motion for attorney's fees and the accompanying affidavits must be filed no later than July 7, 2023.  Wells Fargo must respond no later than August 4, 2023.  Final judgment will be entered separately. *See* Fed. R. Civ. P. 54(d)(2), 58(a).

SIGNED on May 31, 2023, at Houston, Texas.

_____
            Lee H. Rosenthal
       United States District Judge